# White's Estate.

*Will—Issue devisavit vel non—Undue influence—Husband and wife—Evidence.*

An issue devisavit vel non is properly refused where the only evidence for the contestants is that the wife of the testator said, not in his presence, but in the presence of the attending physician, that she would leave her husband if he did not execute a will in her favor, that such evidence is contradicted, and that there is affirmative evidence that the testator directed his will to be made by an attorney, that it was read to him, and approved by him, and that he gave as his reason for making it in his wife's favor, that she had cared for and nursed him for many years, and that his children had neglected him.

Argued March 13, 1907. Appeal, No. 168, Jan. T., 1906, by Wert White, from decree of O. C. Adams Co., dismissing appeal from register of wills in Estate of David McC. White, deceased. Before RICE, P. J., PORTER, HENDERSON, MORRISON, ORLADY, HEAD and BEAVER, JJ. Affirmed.

Appeal from register of wills.

SWOPE, P. J., filed the following opinion:

.This is an appeal from the decree of the register admitting to probate a paper purporting to be the last will and testament of Dr. David McConaughy White, late of Hampton, Adams county, Pa., and the contestant asks for an issue to determine:

1. Whether the said David McConaughy White was at the time of the execution of said instrument of sound, disposing mind, memory and understanding, and of sufficient mental capacity to make a valid will.

2. Whether the said David McConaughy White was induced to make said paper writing by undue influence of the said Mary White or others..

Contentions of this character always present a more than ordinary duty upon the court, for we are here required to pass upon the nature and character of the evidence in support of the petition, and under a judicial determination of the same.

As remarked by Mr. Justice DEAN in Robinson v. Robinson, 203 Pa. 400 : " The orphans' court of the commonwealth are especially bound to discourage litigation of this kind unless based on reliable evidence of material facts, by refusing an issue. And even where an issue is granted, if after the case has been fully developed, the court in view of the whole evidence, considers it not sufficient to sustain the material facts, it is bound to set aside the verdict."

The issue is of right, when the fact arising and in dispute is substantial, unless the whole evidence of the fact be so doubtful and unsatisfactory, that a verdict against the validity of the will ought not to be allowed to stand : Schwilke's Appeal, 100 Pa. 628.

The test to be applied is, would the trial judge, after a careful review of all the testimony, feel constrained to set aside a verdict against the proponents of the will, obtained upon a fair and impartial trial, as contrary to the manifest weight of the evidence : Graham's Appeal, 61 Pa. 43 ; Knauss's Appeal, 114 Pa. 10 ; Sharpless's Estate, 134 Pa. 250 ; Levis's Estate, 140 Pa. 179.

As stated by Mr. Justice STEWART in Masseth v. Masseth, 213 Pa. 434 : The question before us is whether the evidence discloses a " substantial dispute about a material fact."

If it does the issue asked for should be granted. If it does not the issue should be refused.

In reference to the sacred right of disposing of our property by will, we cannot refrain from quoting the words of Mr Justice PAXSON in Cauffman v. Long, 82 Pa. 72 : "No right of the citizen is more valued than the power to dispose of his property by will. No right is more solemnly assured to him by law, nor does it depend in any sense upon the judicious exercise of it. It rarely happens that a man bequeaths his estate to the entire satisfaction of either his family or friends. In many instances testamentary disposition of property seems harsh, if not unjust, the result, perhaps, of prejudice as to some of the testator's kindred, or undue partiality as to others. But these are matters about which we have no concern. The law wisely secures equality of distribution when a man dies intestate. But the very object of a will is to produce inequality and to provide for the wants of the testator's family ; to pro-

tect those who are helpless ; to reward those who have been affectionate, and to punish those who have been disobedient. It is doubtless true that narrow prejudice sometimes interferes with the wisdom of such arrangements. This is due to the imperfections of our human nature. It must be remembered that in this country a man's prejudice is a part of his liberty. He has a right to them ; he may be unjust to his childen or relatives ; he is entitled to the control of his property while living and by will to direct its use after his death, subject only to such restrictions as are imposed by law. Where a man had sufficient memory and understanding to make a will, and such instrument is not the result of undue influence, but is the uncontrolled act of his own mind, it is not to be set aside in Pennsylvania, without sufficient evidence, nor upon any sentimental notion of equality."

Having these principles in mind, and upon a very careful examination and study of all the testimony in this case, we are of opinion that the evidence submitted does not disclose a substantial dispute about a material fact; that under all the testimony we would feel constrained to set aside a verdict against this will as contrary to the manifest weight of the evidence. We must therefore refuse the issue asked for.

Dr. White died at his home in Hampton on May 19, 1905, at the age of eighty-four years.

Dr. White left a widow, Mary White, who is now forty-seven years of age. She was married to the doctor in 1878.

They had no children, but Dr. White by a previous wife had four children : Emma B. White (now Foster) and Sarah White, now of Columbus, Ohio ; Herbert White, of Elwood City, Ia. ; and Wirt White, the contesting petitioner, of Hampton, Adams county, Pa.

When the doctor married his present widow in 1878, his children all left home. They were apparently more than displeased with this alliance of their father. Whether this was because of the great disparity as to age, or other reasons, does not appear from the evidence, but they shook the dust of their parental home from their feet and utterly abandoned both their father and his new wife.

This desertion continued until the time of Dr. White's death, a period of twenty-seven years, with the exception of a brief

call by Mrs. Foster a few years ago, who remained but a few minutes and did not sit down. This call, we think, was one of curiosity rather than a desire for reconciliation, and when she left, the doctor said, she only called to make trouble and disturbance.

Wirt White, the petitioner, lived in Hampton. After this second marriage he never visited his father. He never had any conversation with him as far as the evidence shows. He did not call to see him during his last illness or attend his funeral.

This abandonment by his children and their persistence in it, was a matter of great annoyance to Dr. White. He spoke at different times of their not treating him right and said they would get nothing of his estate.

For twenty-seven years the doctor and his wife lived alone in his home in Hampton. After he became afflicted in his lower limbs she led him to the post office and stores. In his final sickness his wife was his only nurse, and there is nothing in all the evidence to justify any other conclusion but that in all these years she was a good, true and faithful wife.

Dr. White became bedfast or "took his bed" March 14, 1905.

He was a man above the average in intelligence. He was a addicted to profanity as a habit, and, as was admitted at the argument, he had his own views as to the future state.

At the time of his death Dr. White owned a house and eight acres of ground worth not over $1,500 and personal property of the value of a few hundred dollars. This constituted his entire estate.

On April 15, 1905, Dr. White formally executed the following brief will, which after his death was duly probated in the register's office of Adams county:

"The last will and testament of David McConaughy White, of Hampton, Reading township, Adams county, Pennsylvania.

"I give, devise and bequeath all my estate, real, personal and mixed, of whatever nature and wheresoever situate, to my beloved wife, Mary White and appoint her as the sole executrix hereof.

"I desire that if her circumstances may allow it, that she would assist my sons Wirt White and Heber White, if they

or either of them should come to want, so far as she may be able to help them, without prejudice to herself, but this provision is not imperative upon my wife and she is to be the sole judge as to carrying out this request and of the circumstances.

"In witness whereof I have hereunto set my hand and seal this 15th day of April, A. D. 1905.

(Signed) "DAVID McCONAUGHY WHITE." [Seal.]

Under the evidence in this case, the fact that this will was signed by Dr. White with his full name is not without significance and should not be overlooked.

A short time before the execution of this will Dr. White sent his wife to Mr. D. S. Chronister, Esq., that he wanted to see him on business. It is true the wife went for Mr. Chronister, but it is also true that the doctor was bedfast, that he and his wife were living alone, and she was the only person he had to send.

Mr. Chronister called to see the doctor. The doctor detained him about an hour. They were alone together. The wife was not present. He told "Squire" Chronister about his family troubles. That his children had not treated him right. He said "he had nothing except the property there, that is, the house he had there and some personal effects," and he said (meaning his wife) "she would get little enough if she got it all."

Dr. White then dictated to Squire Chronister the character of will he wanted, and directed him "to go to Judge McClean, dictate to him just what he said and have his will prepared according to his dictation, and if, when I returned, it was not in accordance with his wishes, I was to make arrangements with Mr. McClean that he would 'phone him, and he was to call personally to see him; come down there and see him."

Mr. Chronister had the will prepared by Judge McClean, and the same day took it back to Dr. White. He was alone with Dr. White; the wife was not present. Dr. White read the will and said: "It is just as I told you; it is all right." He said that he would not sign it that evening; that he wanted "to look over it, examine it and see that it is satisfactory."

Mr. Chronister further testifies: "Some few days after that (referring to the above) possibly three or four days after that,

Mrs. White told me the doctor wanted to see me ; that he was now ready to sign the will."

When Mr. Chronister went in he was alone with the doctor. His son Chester, who was to be a witness to the will, had not arrived yet, and Mrs. White was not in the room.

The doctor said he "was going to sign the will now ; it was all right with one exception," he says ; he said, "I am sorry this desire is in it (referring to requesting wife to support sons if they came to want). He said he was sorry that he put that in." I made this remark : "Doctor, I do not think that that can hurt Mrs. White ; how will it affect her ?" He did not say anything against it and said "he would sign it."

"By that Mrs. White came in . . . . and he authorized Mrs. White to get the will." She helped to raise him up ; she got the will, pen and ink, and helped him to sit in a comfortable position on the bed. Before Chester came in Mr. Chronister remarked to the doctor : "Doctor, if you do not feel strong enough, or do not wish to write your name, you can simply make your mark." He said : "I can write my name and I am going to do it." When Chester came in and Dr. White was about to write his name, Mrs. White said : "The Squire says you can simply make your mark if you do not wish to write." He said : "Damn you, I know my own business ; I am able to write my name and I am going to do it."

After the will was signed and witnessed by Mr. Chronister and his son Chester, Dr. White handed the will to Mr. Chronister and told him "to take charge of it and keep it."

Mr. Chronister said the doctor was as bright as a man under his circumstances could be ; he says he knew what he was doing undoubtedly.

The contestants admit a failure to show a lack of testamentary capacity on the part of Dr. White at the time of the execution of this will, but earnestly press their right for an issue to determine whether the will was not procured by the undue influence of Mrs. White, and in this connection we are properly asked to consider the age, physical weakness and claimed mental weakness of the testator.

Undue influence must operate upon the mind of the testator at the time the will was made, and the burden of proving it is upon those who allege it.

As stated in Tawney v. Long, 76 Pa. 106, and approved in Robinson v. Robinson, 203 Pa. 400, "Undue influence of that kind which will affect the provisions of a testament, must be such as subjugates the mind of the testatrix to the will of the person operating upon it, and in order to establish this, proof must be made of some fraud, practical, some threats or misrepresentations made, some undue flattery, or some physical or moral coercion employed, so as to destroy the free agency of the testatrix, and these influences must be proved to have operated as a present constraint at the very time of making the will."

The contents and character of the will may be evidence bearing on the question of undue influence : Patterson v. Patterson, 6 S. & R. 55; Baker v. Lewis, 4 Rawle, 356.

The only evidence in supporting the claim of undue influence is that of Dr. Spotz, who was the attending physician of Dr. White in his last illness.

The doctor testifies as to several conversations he had with Mrs. White :

"The first conversation in reference to this matter was previous to the making of the will. She told me she did not think he had made a will. He ought to have a will. He has told me he has protected her, but she don't believe it, and asked me if I did not think she should have some protection. I told her I did.

"In another conversation at a subsequent time, I do not remember the date, she told me she got him to make a will, he intended to send for Squire Chronister.

"At another conversation she told me he has made a will but refuses to sign it.

"Another conversation she told me he still refuses to sign it ; that she got mad and she swore and told him by God if he don't sign it, he has got to sign it, and if he don't sign it he can lay here and she will leave.

"Another conversation, subsequent conversation, she told me, she patted me on the shoulder, she is all right now, she is fixed, he has signed the will." Or, as he stated later, "I am all right, it is my way."

All of these conversations are denied by Mrs. White. Now, not assuming the province of the jury in determining what the

truth is, but admitting all of these declarations to have been made, does it raise such a substantial dispute as to the legality of this will, as the will of Dr. White, as should be submitted to a jury?

After careful consideration we feel it does not.

This wife had the legal right to request her husband to make a will in her favor, and even to importune him so to do, if the only effect was to make his affections or sense of duty or judgment: Robinson v. Robinson, 203 Pa. 400.

The only portion of the wife's statements to Dr. Spotz, therefore, which shows undue influence on her part, was this one declaration: " He has got to sign it and if he don't sign it he can lay there and she will leave."

This was clearly undue influence, and if the interests of Mrs. White were alone involved, an issue might be granted as a rebuke of this innuendo of assertion, that she forced the execution of his will, but the primary object of our case is the will of Dr. White.

A man's last will and testament is not to be set aside by the too hurried anxiety of a wife who unduly attempts to influence him to do a thing which he has arranged for, expected and fully intended to do. This is not subjugating the mind of the testator to the will of the party importuning.

To sustain the charge of undue influence two things must be shown:

1. The fact that undue influence was exercised.

2. That it was effective in producing the alleged result.

For the purpose of this case we may admit this one attempt of undue influence, but we deny the establishing of the second requisite, as clearly opposed to the weight of all the evidence.

The testimony on the part of the exceptant even, we think, shows that Dr. White's mind did not weaken and give away with the infirmities of his body. It shows he was assertive and brooked all character of interference with his affairs up until close to his death, at least until after the execution of his will.

When we recall the nature of his will: That it was as he had previously declared to his friends he would make it; that it was the character of a will to be expected as his own voluntary act, under all the circumstances.

That the will executed on April 15, 1905, was exactly the

same paper that Dr. White dictated to his friend Squire Chronister, after an hour's private talk with him, when he acquainted the Squire with his family troubles, the treatment of his children and the amount of his estate, and then recalling all the circumstances surrounding the execution of the will; the private talk again with Squire Chronister about the one portion of the will he regretted having put in ; his being satisfied as to that, and, when it was suggested he could make his mark, he refusing so to do, and gladly giving to his last will and testament the affirmance and approval of his full name.

In the face of all these clearly proven facts, does this one isolated threat made by Mrs. White raise a substantial dispute as to whose will this was ?

This expression made to Dr. Spotz, who was then friendly to her and had expressed as his opinion that she ought to receive some protection, may have been an exaggeration of the real facts.

But admitting the threat was made to Dr. White—was it seriously made and so considered by the husband, or was it but the momentary spasm of a woman's annoyance ? When made, in the light of all the testimony, was she not simply urging him to do what it was his wish, desire and intention to do ?

Is there any evidence, or any circumstances from which a fair presumption could be drawn, that either in the dictation or execution of this will Dr. White was constrained to act as he did by the undue influence of his wife ? We think not.

The clear weight of all the evidence shows that in the dictation and execution of his will, Dr. White was giving expression to his own free and untrammeled choice.

Dr. Spotz refers to a certain conversation Dr. White had with him in reference to his death :

" He said : ' When I am dead you come to see that I am dead.' He said : ' Pay no attention to Mary, pay no attention to anybody ; you are the only person I can put confidence in.' He said : ' Pay no attention to any other doctor, see that I am dead ; Mary will be glad when I am gone.' "

This is urged as a reflection on his wife, and showing Dr. White's fear of her. This, we think, is a clear distortion of the apparent meaning of the doctor and his intention. Like

WHITE'S ESTATE.

many strong-minded men, Dr. White seems to have had a horror of being buried alive, and requested Dr. Spotz to see to it that he was really dead.

When he said, " You are the only person I can put confidence in," there was no intended reflection on his wife, for he was referring only to the ability to ascertain the fact that he was really dead. Neither was there any reflection on her when he said in that connection, " Mary will be glad when I am gone." He was merely appreciating his old age and helplessness, and that she would be relieved of her attention and care for him when he was gone.

This is but the reasonable construction to put upon the doctor's request in this matter and his statements in reference to it. It also occurs to us that in this private talk in the very face of death, that if Mrs. White had constrained Dr. White to make a will against his wish, he would then have told him so. This conversation as detailed by Dr. Spotz we think also showed a clear and active mind on the part of this testator.

[Believing that the manifest weight of all the evidence shows that the execution of this will was the free and voluntary act of Dr. White, that the evidence discloses no substantial dispute as to that fact, and that a verdict against the validity of this will ought not to be sustained, this appeal is dismissed and the issue prayed for is refused.] [1]

*Error assigned* was portion of opinion as above [1].

*S. S. Neely*, with him *Wm. Kersh*, for appellant.

*W. C. Sheely*, with him *Wm.* and *Wm. Arch McClean*, for appellee.

OPINION BY HENDERSON, J., April 15, 1907:

The appellant alleged testamentary incapacity and undue influence as reasons for setting aside the instrument probated as the last will of David McC. White. On the hearing of the rule for an issue the allegation of incapacity was abandoned. The charge of undue influence was supported by the testimony of a single witness, the attending physician, who testified to declarations made by the wife of the testator who was the sole

devisee. These declarations were not made in the presence of her husband, nor was any fact testified to by the witness other than the declarations referred to. This evidence would indicate that Mrs. White was anxious to have a will made in her favor and that she had told her husband that if he did not execute one she would leave him. It is not clear that this, if uncontradicted, would be sufficient to overthrow the will. It does not prove that that document was executed because of the threat. The wife had a right to urge her husband to regard her when he made his will. Such solicitation on her part would not amount to undue influence: Dean v. Negley, 41 Pa. 312; Trost v. Dingler, 118 Pa. 259. But the testimony of Dr. Spotz is contradicted by Mrs. White, and the evidence of the witnesses for the appellee shows very clearly the individual volition of the testator in the execution of the will. It was dictated to a neighbor, when the testator's wife was not present, who was directed to take the memorandum to Judge Mc-Clean and have the will formally prepared, and after the preparation of the will it was read by the testator in the presence of Mr. Chronister and declared by him to be in accordance with his direction. He also discussed its provisions with Mr. Olewine and gave his reasons both to him and to Mr. Chronister for making it as he had. His estate was small, his wife had been his faithful companion for many years and had nursed him constantly during his illness; his children had neglected him, and these considerations influenced him to make the will as it was. The evidence is overwhelmingly in favor of its validity and the learned judge of the orphans' court has given full, clear and satisfactory reasons for his action. An issue is of right only where there is a substantial dispute about a material fact, and where the evidence is so doubtful or unsatisfactory that the court should not permit a verdict to stand against the validity of the will an issue should not be granted. The numerous authorities cited in the opinion filed in the court below render a discussion of the subject unnecessary. The appellant wholly failed to overcome the presumption in favor of the validity of the will and the evidence presented by the appellee in support thereof.

The decree is affirmed.