## Noble's Estate.

Argued April 9, 1940. Before SCHAFFER, C. J., MAXEY, DREW, LINN, BARNES and PATTERSON, JJ.

*John E. Evans, Sr.*, of *Margiotti, Evans & Pugliese*, with him *Charles J. Spinelli* and *A. H. Lipez*, for appellant.

*M. E. Haggerty*, with him *Henry M. Hipple*, for appellee.

OPINION BY MR. JUSTICE LINN, May 20, 1940:

This appeal is from the refusal of an issue to determine whether testator lacked testamentary capacity and whether the will was obtained by undue influence exerted by Lawrence F. Probst.

This is not a common law action. In *Tetlow's Estate*, 269 Pa. 486, 494, 112 A. 758, we said: "It is the established law of Pennsylvania that, in cases of the

character of the one now before us, the judge is vested with power to decide whether or not he shall submit oral evidence to the jury, even though it be conflicting. It is his right and duty, after weighing the whole evidence impartially, to refuse to present it to the jury unless he either feels the ends of justice call for a verdict against the will, or is so uncertain on this point that he could conscionably sustain a finding either way on one or more of the controlling issues involved. If, after so weighing the whole body of the evidence, the trial judge feels sure that his professional and official conscience would not permit him to sustain a verdict against the validity of the will, either because the contestants' proofs lack probative force or are legally inadequate, or because those that are reasonably worthy of credence raise no material conflict on any governing point, or the 'prima facie case' which they present has been 'so overcome by opposing proof as to leave no substantial dispute' *(Sharpless's Est.,* 134 Pa. 250, 259; *Fleming's Est.,* 265 Pa. 399, 406), it is his bounden duty to instruct the jury peremptorily against the contestants: *Phillips's Est.,* 244 Pa. 35; *Fleming's Est.,* 265 Pa. 399, 406." In *DeLaurentiis's Estate,* 323 Pa. 70, 77, 186 A. 359, we said: "As applicable to these cases the principle is laid down in unmistakable though variously expressed terms, that a party is not entitled to have an issue submitted to a jury merely because he produces enough evidence to make out technically a prima facie case." In *Dible's Estate,* 316 Pa. 553, 554, 175 A. 538, the rule was stated to be: "We have repeatedly held that in reviewing a chancellor's refusal of an issue devisavit vel non the question for the appellate court to decide is not whether it would have reached the same result had it been acting as chancellor, but rather whether a judicial mind, on due consideration of the evidence as a whole, could reasonably have reached the conclusion of the chancellor: *Tetlow's Est.,* 269 Pa. 486;

*Fink's Est.*, 310 Pa. 453. As we said in Tetlow's Estate, 'When the answer to this question is in the affirmative, the judgment appealed from will not be disturbed.' In other words, the chancellor's decision will not be reversed unless an abuse of discretion on his part appears: *Doster's Est.*, 271 Pa. 68; *Mark's Est.*, 298 Pa. 285; *Fink's Est.*, supra."

The testator, James Noble, a resident of Lock Haven, died May 8, 1936, aged 79, leaving a will dated January 30, 1935. It was admitted to probate May 11, 1936. Jessie Dornblaser and Edith Lentz,[1] cousins of testator's deceased wife, appealed from the probate. One of them, Jessie Dornblaser, is the appellant in this court. Testator was a widower; his nearest surviving relative was a niece, residing in New York City; he gave nothing to her. She testified she had seen him only once in many years.

The will was typewritten by Lawrence F. Probst at the dictation of the testator who dictated in part from a former will made by him. Probst was appointed executor and is a substantial beneficiary. Testator gave 13 pecuniary legacies totaling $12,500. The contestants, Jessie Dornblaser and Edith Lentz, received $500 each. A legacy of $3,000 was given to Emma Bartlett, his housekeeper. He gave Probst a legacy of $1,000 and his stock in the Clark Printing and Manufacturing Co. (appraised at $1,500) which he had acquired at the instance of Probst. The last legacy was as follows: "I give full power to my Executor Lawrence F. Probst to sell all of my assets, Real or Personal and the proceeds to go to him after all of the above bequests have been

---

[1] This contestant did not testify and we find no evidence that she had any acquaintance with the testator. In appellant's brief it is said: ". . . we would call this Court's attention to the noteworthy fact that the Contestants are the heirs of Mrs. Noble who in equity and justice should receive this money as it had its origin in their family."

settled as I have explicit faith that he will and has always done the right thing by me ever since my old working days."

Decedent had been a typesetter employed in the Clark Printing and Manufacturing Company. He was an industrious man, living with his wife on his earnings as a printer until she, in 1926, received from her brother what, for them, was a large legacy. He then, or shortly afterward, gave up his employment. His wife died August 20, 1933, leaving a will dated August 8, 1933. She provided that Emma Bartlett, their housekeeper, should receive $45.00 per month so long as she remained his housekeeper. The income of her estate, subject to the housekeeper's legacy, was payable to her husband together with so much of the principal as he might need. She also gave him a power of appointment to be exercised by will with the proviso that, if he failed to appoint, the trust property should be distributed among "her legal heirs according to the Intestate Laws of Pennsylvania." At Noble's death the trust property amounted to $68,347. Outside the trust, Noble's estate appears to have been less than $8,000.

The proponent, Lawrence F. Probst, who typed the will, was 39 years of age when the testimony was taken in 1937; he first met the Nobles when about 9. As a boy, in 1915, he was employed by the Clark Printing and Manufacturing Company by which Noble was also employed; at the time his testimony was taken, Probst was manager of the printing company. It was at his instance that Noble was able to buy "stock of the company at a special rate." Probst frequently went about with him; addressed him, as many others seem to have done, as Uncle Jim and Mr. and Mrs. Noble addressed Probst as Hun. The friendship over a period of years became close. Probst testified that Noble told him "that the will that he had he was not satisfied with he wanted to make out a new one, I told him to go back to his attorney. Q. What did he say to that? A. He said he

would not go to an attorney, he said, 'You have got to make it,'—I refused to do it. Q. How many times did he request you to make a will for him? A. At least eight or nine times. Q. What was your answer? A. I told him that he should go to an attorney, and if he didn't like the one he had I told him of three other attorneys that he could go to. Q. Did you name the attorneys? A. Yes, I did." Probst testified that the will was written on January 28, 1935, a day on which he, Probst, was required to leave on a western trip after the annual meeting of the printing company. The record shows: "Q. Did you see Mr. Noble before you went away on your trip? A. Mr. Noble got there in the office at nine-thirty, I went in at nine-thirty, I was very much surprised to see him there at that early hour, he was never in a habit of being up so early. Q. What did he ask you to do? A. He asked me, he said, 'I have my old will marked, and you have to typewrite this new one for me,' I said, 'You better go down and get an attorney,' he said, 'I don't wish to get an attorney,'—'Why not?'—'I don't want an attorney,' he said. Q. Did he explain why he didn't want an attorney? A. Frankly, Mr. Haggerty, [the examining counsel] he was mad at you. Q. Why was that? A. For the charge that you made in settling the other estate [presumably Mrs. Noble's]. Q. Did you know what that charge was? A. $1,000. Q. Did he claim that was too much? A. Yes, sir. Q. What did you do then? A. I got the paper and told him to sit down and went over the whole thing and typed it as he had it fixed up the way he had it marked, he talked about different people, he said that he wanted Rosamond Waters to have $3,000 [the will contained such a legacy] the same as Mrs. Bartlett [the housekeeper] so there would be no women fighting,— he went down the list and came to the little McCollum girl, he said he was glad he was able to give her $1,000 for Mrs. Noble always adored her. Q. How's that, what was that about the McCollum girl? A. He said he was

glad he was able to give her $1,000 for Mrs. Noble always adored her,—then he came to the Clark Printing Company stock, he said, 'I want you to have this because you got it for us.' Q. Had he offered you that stock before? A. Yes, sir, it was mentioned before,—may I talk? BY JUDGE EVANS: [counsel for contestants] That is objected to, that was all in writing. BY MR. HAGGERTY: Q. In reference to the Clark Company stock? A. Mr. Noble offered me that stock many times, I told him that I would not take it, when he put it in the will he said, 'I want you to have that stock.' Q. Did he mention any of the other legacies, anything about any of the others? A. He mentioned Mrs. Peck in Boston, that he was glad to give them something, that they were good friends of Annie's, and he wanted to help them. Q. Did he mention anything about the bequest of the $1,000 to you? A. He told me that he was giving me the balance of the estate and when he came to the $1,000 I said, 'Why do you give me this $1,000 if you are going to give me the balance?' —he said, 'You will have to have some money, it will take a long time to get this thing settled, and I know what that is.' Q. What did you say when he told you you were getting the balance of the estate? A. I said, 'Do you not want an attorney?'—that it would be rather embarrassing to me, he says, 'What do you care as long as you have the money?' Q. Did you make any suggestions about the balance of the estate? A. 'Do you have any idea what it is?'—'Well, it ought to be about $50,000.' I suggested that the $50,000 should be divided up one quarter to the hospital, one quarter to the high school to carry on the work that Mrs. Noble had started, one quarter to be divided up between the Methodist Churches and the Methodist Home in Tyrone and one-quarter to the Salvation Army and the Community Chest and he said, 'No, sir, not one cent to charity.' Q. Did you type the will? A. I did. Q. Did you have the old will before you? A. He had the old will, I didn't

see what was on it.  Q. Did he instruct you what to write?  A. Yes, sir, he did.  Q. Did he read the will to you in your office?  A. He watched me as I wrote it, as I typed it.  Q. Did you read the will to him? A. No, sir, I did not.  Q. What did you do with it when you finished it?  A. I didn't date the will, I talked to him about taking it and reading it and told him it was not dated, and to be sure he was right before he signed it, and witnessed it, he said, 'This is exactly what I want, if I want to put a codicil to it anytime I can do it.' " Noble took the draft away with him.

The evidence would support a finding (and would not support one to the contrary) that Noble knew exactly what he was doing and the probable value of the property passing by the will and to whom he wished to give it.  The brief of appellee states that the amount mentioned by testator to Probst, as appears in his testimony, "is approximately correct," by which we understand it to be about the amount of the estate less taxes and necessary deductions.  There is little difference between this and the gross amount, without reduction, as stated by appellant.[2]

Charles Bowes, one of the subscribing witnesses, is proprietor of the Russell Hotel, next door to the apartment house in which Noble lived.  Bowes said he saw Noble almost every day; that he came into the hotel office with the will and said he desired it witnessed. Bowes called in his brother and Chester B. Viechnicki, a teacher in the high school who lived in the hotel.  In

[2] In appellant's brief it is said: "Yet the record-evidence discloses that he had an income from an estate of more than Sixty-eight Thousand Dollars ($68,000.00) under his wife's Will, with authority to consume the principal if necessary; and that, at the time of his death, he had in his own account in the bank the sum of One Thousand Four Hundred Forty-two Dollars and Four Cents ($1,442.04), and that there was, in the Trustees' hands, an income available to him in the amount of Two Thousand Two Hundred Twenty-five Dollars and Seventy-eight Cents ($2,225.78) . . ."

their presence Noble executed the will and at his request they subscribed as witnesses. There is evidence that he told various friends at the Elks' Club that he had made his will and that he "got the two Bowes and Viechnicki to witness the will and I signed and dated it and took it over to the Lock Haven Trust Company where it's in a safe deposit box." It was dated January 30, which was two days after it was typewritten by Probst.

Two of the subscribing witnesses had known him 20 years and one about 3 years. Their evidence completely negatives any suggestion of lack of testamentary capacity and of undue influence. After testator gave up his employment, notwithstanding the legacy to his wife, they continued to live modestly as they had been required to live before. He seems to have spent considerable time at the Elks' Club in Lock Haven and at one or two hotels. He frequently played cards with his friends. Among proponent's witnesses were the friends with whom he appears to have spent his time. They testify that he was whimsical and give instances of what they call his tendency to "kid." He frequently talked "more or less in a kidding way—we all kidded with him." Eight witnesses referred to this characteristic. Concerning declarations made by him as related by witnesses on behalf of the contestants, the learned court below concluded that in some instances, at least, testator was probably intentionally mystifying and that the declarations did not indicate the lack of memory which contestants suggested should be inferred from them. The evidence that Noble drank to excess may be put aside as without significance in its relation to the two issues for consideration. On this subject, his housekeeper testified and, as she was called as a witness for contestants we assume this statement fairly represented the fact: "Q. Was Mr. Noble a man to use intoxicating liquors? A. Yes, sir. Q. Tell me whether or not he used it to excess? A. Sometimes he did. Q. How oft-

en? A. Well, no, I can't tell you how often, sometimes it was often,—he always had to have it all the time. Q. He used some liquor all the time? A. Yes, sir, especially in the morning when he got up, he was troubled with asthma, he would have to use it to get the phlegm out of his throat, sometimes in the bathroom he would spit for half an hour, if he would take some liquor, he took it as medicine for that purpose." He had been a sufferer with asthma all his life; in addition, one of his legs was afflicted. He required medical attention more or less frequently, and for many years had the services of Dr. Lubrecht, a witness who testified in favor of the will. He had known testator and his wife since 1908 and had been their family physician upwards of 20 years. We have read his testimony in the light of appellant's complaint of the contradictions by contestant's witnesses. The doctor admitted that he said Noble was not competent to make a will after August, 1935, when he suffered a slight stroke; the witness was certain Noble was competent prior to that time. As the will was made in January, 1935, and as more than a dozen witnesses give evidence of competency before that date and of a mental condition negativing the idea that testator would probably be the victim of undue influence in January, 1935, when he made his will, we agree with the comment of the learned court below: ". . . we have come to the conclusion that the consideration of contestants' evidence alone is not sufficient to sustain a verdict of testamentary incapacity in this case."

The two grounds on which the issue was asked, lack of testamentary capacity and undue influence shade into each other. There is really no evidence worthy the name to be submitted to the jury on the point of undue influence. A number of the testator's friends testified to expressions of affection for Probst made from time to time by the testator. At the time he made his will the testator was old, was not very well, had lapses of memory but notwithstanding these infirmities, was com-

petent to make a will. He kept it until he died more than a year and a half later. Considering all the circumstances disclosed in the evidence and discussed at length by the learned court below we all agree that there is no support whatever for the suggestion that there was abuse of discretion in refusing the issue. In addition to the cases quoted above see generally: *Llewellyn's Estate*, 296 Pa. 74, 145 A. 810; *Minnig's Estate*, 300 Pa. 435, 150 A. 626; *Brennan's Estate*, 312 Pa. 335, 168 A. 25; *Kline's Estate*, 322 Pa. 374, 186 A. 364; *Geist's Estate*, 325 Pa. 401, 191 A. 29; *Buhan v. Keslar*, 328 Pa. 312, 194 A. 917; *Kish v. Bakaysa*, 330 Pa. 533, 199 A. 321; *Olshefski's Estate*, 337 Pa. 420, 11 A. 2d 487.

The order appealed from is affirmed; costs to be paid out of the fund for distribution.