Williams *v.* McCarroll, Appellant.

282

Argued April 15, 1953. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ. Appeal, No. 32,

*Frank X. York,* for appellants.

*John H. Bigelow*, with him *Bernard J. Duffy, Jr.* and *B. J. Duffy, Sr.* and *John G. Cipko*, for appellee.

OPINION BY MR. JUSTICE BELL, May 25, 1953:

Thomas McMullen, a single man, died August 1, 1945, having made this contested will on February 9, 1945. Two questions were submitted to a jury for determination: (1), did McMullen on February 9, 1945 have testamentary capacity, and (2) was his will obtained by undue influence? The first jury was unable to agree whether McMullen had testamentary capacity, but found that his will was not obtained by undue influence. On a retrial the jury found that McMullen did not have testamentary capacity to make and execute a valid will on February 9, 1945, and that the will was obtained by undue influence practiced upon McMullen by his nephew, Russell Williams. The Chancellor who saw and heard the witnesses entered judgment non obstante veredicto. The testimony exceeded 1,000 pages, so it will be necessary for us to briefly summarize what we consider to be most important.

The will (or alleged will) gave his sister Margaret, with whom he had lived for 60 years, all his property for life with power of consumption for support and welfare; and upon her death the property remaining was given to Margaret's son, Russell Williams, except for 3 legacies of $1,000 each. Russell Williams lived with his mother and Thomas McMullen and was the latter's frequent companion; the contestants rarely ever saw their uncle and were not on friendly terms with him.

Plaintiff proved the will by two disinterested subscribing witnesses and rested. Contestants then produced 7 witnesses, all of whom were interested, who testified that decedent was of unsound mind and incapable of making a will. Most of them had not seen

decedent for two years prior to the will but they testified that he acted funny, mumbled, rambled, was incoherent, had peculiarities, had a blank look on his face, did not recognize them, suffered from loss of memory, and did a number of things which a rational man would never have done. Several additional witnesses corroborated them in small details. Two doctors who saw testator five months after he made his will testified that he was in their opinion incapable of making a will, since he was suffering from senile dementia caused by arteriosclerosis. However, it was admitted that it was possible for a person with that disease to have lucid intervals, and the testimony of the doctors was considerably shaken on cross-examination. Another witness for contestants, Judge McCready, expressed the opinion that during 1943 a guardian should have been appointed for McMullen. He further testified that in his opinion McMullen was mentally ill; but he had no knowledge of deceased's mental capacity during February, 1945, and was unable to say whether McMullen was qualified to make a will at that time.

Plaintiff then produced 12 witnesses (in addition to himself and the 2 subscribing witnesses), and decedent's attorney who drew the will and had known decedent intimately for 45 years, and two doctors, one of whom had been the family doctor who had seen and treated testator every two weeks for the last six to eight years of his life. Most of these witnesses including the family doctor and decedent's attorney were disinterested witnesses, and the lengthy testimony of the attorney was especially strong and convincing. From a reading of the Court's opinion it appears to us that he believed plaintiff and his witnesses and doubted or was unimpressed by defendants' interested witnesses and doctors.

We quote the following excerpts from the very able opinion of President Judge KREISHER, who was specially presiding:

"This was a trial of an issue *devisavit vel non.* . . .

"The plaintiff-proponent made out *a very strong\* prima facie* case by the proof of the document's execution and the subscribing witnesses. . . .

". . . It is . . . the rule in Pennsylvania that in every case in which the question of testamentary capacity and the allegation of undue influence is presented to the court for determination, it is important to examine the disputed document itself to ascertain whether the testamentary scheme is natural and reasonable and in harmony with the family background. We have quoted the contested document above with the foregoing principles in mind, and we at first observe that Mr. Hollar and Mr. Frantz, the subscribing witnesses, were both disinterested in the outcome of this controversy, and in no way related to any of the parties. *We also note that the document was prepared by the decedent's own attorney,* in the attorney's office, and that *the decedent's own physician at the time of the execution of the document issued a certificate, certifying that the decedent had the mental capacity to execute a will.* It is announced in all of the late cases in Pennsylvania that we have examined, that less capacity is required to make a valid will than is sufficient in most cases to transact ordinary business, and that *the capacity of the testator at the time of the execution of the will* is the decisive and focal point of the inquiry. In analyzing the contents and dispositions made in the disputed document itself, we find that the testamentary scheme therein set forth is, in our opinion, *a natural and reasonable disposition, and in harmony with the*

---

\* Italics throughout, ours.

*family background.* The testimony clearly indicates that the decedent lived approximately sixty years of his life with his sister, Margaret Williams, and that the chief beneficiary, Russell Williams, grew up in the same household with the decedent. The testimony further shows that Russell Williams, after the deceased's retirement, befriended his uncle and gave all his time and talents for his uncle's comfort. He drove him to various doctor's offices for treatment of his physical ailments; he took care of his clothing needs, and it appears that the decedent was always an immaculate dresser.

"In contrast to this, the *contestants in the case admitted that they only infrequently visited or saw their uncle; that they were not on friendly terms with Thomas McMullen* or his sister, Margaret Williams. It further appears that Edwin Williams, a brother of Russell Williams, who also grew up in the home of Thomas McMullen, left the home a number of years before Mr. McMullen retired, and that he was not in the daily contact with his uncle that Russell Williams was. So that from an analysis of the will itself, the testamentary scheme in our opinion is natural and reasonable, and in harmony with the family background. . . .

"*Doctor Robert A. Christman* has engaged in the practice of medicine at Lehighton for a period of thirty-five years. He testified that he treated Thomas McMullen as a patient from 1941 up to 1945, and that he saw him about every two weeks. He testified that decedent had some trouble with his prostate gland and other ills. He testified that on February 8th, 1945 Mr. McMullen came to his office in company with Russell Williams, at which time he was asked to certify that Mr. McMullen was mentally fit to make a will, which certificate he did make and give to Russell Williams. He was informed that Mr. McMullen was

brought to his office for the purpose of getting this certificate at the request of Frank Riordan, the Attorney and scrivener of the questioned document. He testified that he did not examine him to test his mental faculties, and that he was not a psychiatrist or alienist, but that in his opinion Thomas McMullen was of sound mind. . . .

"Frank S. Riordan, Esquire, testified that he is a member of the Bar of the County of Carbon and of the Supreme Court of Pennsylvania; that he resides in the Borough of Lansford and has practiced law since April, 1916. He testified that he was acquainted with the deceased from the time he was a small boy and *knew him intimately since the summer of 1900*. . . . on January 13th, 1945 he states that Mr. McMullen, the deceased, told him that he wanted to make out a power of attorney to give Russell Williams the authority to do business for him. That in consequence thereof he prepared a general power of attorney and told him to take it out and have it executed. This power was subsequently executed before Justice of the Peace Hollar in Summit Hill. . . .

"He testified that on *February 8th, 1945* Russell Williams came to his office and told him that his uncle wanted an appointment to make a will. He asked Russell where his uncle was, and he stated, 'He is outside.' The witness then said he asked Russell, 'Why don't we do it today?' Russell told him that they had to go to Lehighton after lunch, that his mother and his uncle were going down to see Doctor Christman. Thereupon the witness stated that he told Russell when you are taking your uncle down to Doctor Christman, 'have the doctor look him over and give you a statement that he is able to make a will.' The witness states that he made this suggestion because, upon learning of the power of attorney given to Edwin Williams two years

prior thereto, he decided that he would take precaution in case anything further developed. The witness testified that on February 9th, 1945 both Russell Williams and Thomas McMullen came to his office, according to the previous day's arrangements, to have his will drafted. He states that he told Russell to go to the outer office and he then closed the door and that the deceased sat in front of the desk right across from him, and they talked for maybe five or ten minutes about each other's health, old age, and how they had changed from when they first knew each other. The witness states that then they took up the matter of the business at hand, and that the deceased told him he wanted everything that he had to go to his sister Maggie during her lifetime. 'Maggie' being referred to as Mrs. Margaret Williams, with whom the deceased lived. He states that the deceased then told him to leave a thousand dollars to each of her children, and that after her death he wanted the remainder to go to Russell. The Attorney states that before proceeding to draw the will, he asked the deceased if he had sufficient money to make such a will, and he states that the deceased just laughed a little and said, 'Oh, five times as much.' The witness said he then prepared the document, and after typing the same he read it over to him and he listened carefully. He states that when he finished reading the will the deceased said, 'You have "Brownie" in there.' The witness states that he said 'Yes. You told me that you wanted a thousand dollars for each of the other of Maggie's children, and he is one, isn't he?' The witness then stated that he said to the deceased, 'Now I will have to do it all over.' And the deceased replied, 'Well, no, don't do that. He is no damn good, but you can leave it in.' The witness states that the will was then left as he drew it, that he folded it up and put it in an envelope and gave it to the deceased, and told him to

take it up to Summit Hill to some of his friends that he knew and have it executed and witnessed.

"The witness testified that in his opinion the deceased was on the 13th day of January, 1945, on the 15th day of January, 1945 and on the *9th day of February, 1945, of perfectly sound and disposing mind.* The witness testified that later on in the spring he met the deceased sitting in the car near the Elks Building, and that he had a five or ten minute conversation with him regarding his health and old times, and that on this occasion he understood the conversation, and that, in this witness's opinion, he was of sound mind. . . .

"The medical testimony of the contestants deals with the deceased's condition more than five months after the date of execution, *is unsatisfactorily vague in many instances, and at most is purely speculative* as to the decedent's condition on the date of execution.* Doctor Deichelmann testified that his institution, the Dufur Hospital at Ambler, is a mental hospital. However, he refused to keep the deceased there because he was not a mental case, and then he ventures a guess that in his opinion deceased was of unsound mind six or eight months before he saw him in July of 1945. Doctor Steele diagnosed decedent's condition as acute alcoholism upon his admission to the Coaldale Hospital in July of 1945, in face of the fact that deceased never used alcohol. He stated he knew nothing about dementia, but likewise, without having examined deceased before July of 1945, he ventured what in our opinion

---

* We may add that this Court has often said: "The testimony of medical experts without direct knowledge of the facts is of little weight as against the direct evidence of disinterested witnesses: Kane's Estate, [206 Pa. 204, 55 A. 917] ; . . . Phillips's Estate, [299 Pa. 415, 149 A. 719] ; Cookson's Estate, 325 Pa. 81, 188 A. 904; . . .": *Sturgeon Will,* 357 Pa. 75, 53 A. 2d 139.

was a pure guess that decedent was of unsound mind in February of 1945. . . .

"The testimony of the contestants' lay witnesses is almost exclusively elicited from interested parties, and it is not difficult to connote that much of their testimony was influenced by the interest they had in the ultimate outcome of the case. The contestants' disinterested witnesses did not attempt to indicate what deceased's condition of mind was on the date of execution. They did testify to certain peculiar characteristics of the deceased during the year 1943, almost two years prior to the execution of the document, but Judge McCready and the bankers, called for the contestants, definitely stated that they did not and could not say what deceased's state of mind was on February 9th, 1945. *On the other hand, plaintiff produced many disinterested witnesses who had more frequent contacts with the deceased and observed deceased nearer to the date in question, who, without exception, expressed their opinion that the deceased was of sound and disposing mind.* . . .

"In the present case the plaintiff is not a stranger to the blood, but rather the very person who in our opinion the deceased would naturally favor. Also, the present case is the trial of the issue d. v. n., and *the plaintiff has assumed and met the burden by the overwhelming weight of the evidence* that the bequest was free from fraud, coercion, inordinate flattery or imposition and with a full understanding and intelligent perception on the part of the decedent concerning the disposition he desired to make of his property to the persons and objects named in the will as the recipients of his bounty.

". . . The testimony of the scrivener of the will clearly indicates that the deceased had mental capacity at

the time the document was drafted, that he appreciated the amount and the nature of his property, as well as objects of his bounty, and that the intelligent and reasonable disposition of his property made by said document indicates that the deceased was free from any restraint upon him in the making of the document. *In addition thereto, the testimony of the scrivener sets forth the reason why the contestants were not included in the deceased's disposition, . . .*

" 'A. Well, they both came into the office, I knew what they came for, and I put Russell in the anteroom that I had there and shut the door. Mr. McMullen sat down in front of me across my desk, I asked him how he felt, and a few other inconsequential remarks, and then I said, "You are here to make your will?" He said, "Yes, I am." And then I got my pad that I had there on the desk and I asked him what did he want to do about this will. And he told me that he wanted to leave what he had to Maggie, he called her, as long as she lived, with the power to use any part of it, or all of it, if necessary, that he wanted to leave a thousand dollars to each of her other children. Well, I knew who they were and I wrote them down, and then I said, "Now, what are you going to do with the remainder of this?" And he told me that it should go to Russell. Then I said to him, *"Now, there are others of your relatives, what are you going to do about those?" "Well," he said, "they never have come near me," he said, "they will get nothing and they are not going to squander any of my money." '* . . .

"Therefore, we conclude, after a review of the record as a whole, in the light of the principles found in the appellate decisions, that the evidence of the contestants is insufficient to justify the verdict of the jury, and that the testimony of the plaintiff and the witnesses

called on his behalf is sufficient to justify the Court in setting aside the verdict of the jury and granting the motion of the plaintiff for judgment n.o.v., . . ."

In order to properly evaluate the testimony as well as the contentions of each party in this case we deem it advisable to supplement Judge KREISHER'S opinion by reviewing certain pertinent principles of law.

". . . a decedent possesses testamentary capacity '. . . if he has an intelligent knowledge regarding those who are the natural objects of his bounty, of what his estate consists, and of what he desires done with it, even though his memory has been impaired by age or disease' ": *Franz Will,* 368 Pa. 618, 622, 84 A. 2d 292; also *Sturgeon Will,* 357 Pa. 75, 53 A. 2d 139; *Ash Will,* 351 Pa. 317, 41 A. 2d 620; *Olshefski's Estate,* 337 Pa. 420, 11 A. 2d 487.

If one believes, as the Chancellor did, the testimony of the decedent's attorney who drew the will and of Dr. Christman, the family physician, and of the subscribing witnesses and of a dozen other witnesses, many of whom were disinterested, Thomas McMullen undoubtedly had testamentary capacity.

It is well to recall that "[t]estamentary capacity is presumed. After proof of execution by two witnesses the burden of proof as to incapacity [or undue influence or confidential relationship] is on contestant": *Sturgeon Will,* 357 Pa., supra (p. 81) ; *Lauer Will,* 351 Pa. 438, 41 A. 2d 552; *Cressman Estate,* 346 Pa. 400, 31 A. 2d 109. Moreover, where a will is drawn by decedent's attorney and proved by subscribing witnesses, the burden of proving lack of testamentary capacity or undue influence "can be sustained only by clear and strong or compelling evidence"; and this is especially so if proponents were corroborated by the attending physician: *Higbee Will,* 365 Pa. 381, 382, 75 A. 2d 599;

*Franz Will,* 368 Pa., supra; *Sturgeon Will,* 357 Pa., supra; *Ross Will,* 355 Pa. 112, 49 A. 2d 392; *King Will,* 369 Pa. 523, 87 A. 2d 469; *DeMaio Will,* 363 Pa. 559, 70 A. 2d 339.

Moreover, where mental capacity is at issue, the real question is the condition of the testator at the very time he executed the will, although evidence of capacity or incapacity for a reasonable time before and after the making of the will is admissible as indicative of capacity or the lack of it on the particular day: *Aggas v. Munnell,* 302 Pa. 78, 86, 152 A. 840; *Higbee Will,* 365 Pa., supra.

There was evidence from which a jury or Chancellor could have found that two years before the will and five months after the will the testator lacked testamentary capacity, but the only evidence as to his capacity at the time the will was prepared and executed was that of the two subscribing witnesses, decedent's attorney who drew the will, and the family physician who examined the testator the day before the will was signed, all of whom testified as to his capacity. The evidence on behalf of contestants was on this issue not nearly as strong as that produced by the proponents of the will. Moreover, as Mr. Justice STEARNE said in *Roberts Will,* 373 Pa. 7, 17, 94 A. 2d 780: " '. . . In Aggas v. Munnell, 302 Pa. 78, 85, 152 A. 840, the law is well stated: "Neither old age, nor its infirmities, including untidy habits, partial loss of memory, inability to recognize acquaintances, and incoherent speech, will deprive a person of the right to dispose of his own property. . . . Mr. Justice KEPHART, speaking for the Court, in Lawrence's Est., 286 Pa. 58, states, . . .: 'Old age, sickness, distress, debility of body, peculiar beliefs and opinions, incapacity to do business, partial failure of memory, neither prove nor raise a presumption of incapacity.' " ' "

Contestants alleged in this case not only lack of testamentary capacity, but also undue influence and confidential relationship.

"Although there are a myriad of cases involving confidential relationship and undue influence, the courts have found it impossible to define precisely these terms. Perhaps the best definition [of] . . . a confidential relationship, is found in Shook v. Bergstrasser, 356 Pa. 167, 170, 51 A. 2d 681, where the Court, quoting from Hamberg v. Barsky, 355 Pa. 462, 50 A. 2d 345, said: ' "Confidential relation is not confined to any specific association of the parties, it is one wherein a party is bound to act for the benefit of another, and can take no advantage to himself. It appears when the circumstances make it certain the parties do·not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed; . . . . In some cases the confidential relation is a conclusion of law, in others, it is a question of fact to be established by the evidence": Leedom v. Palmer, 274 Pa. 22, 25, 117 A. 410, 411, 412; Null's Estate, 302 Pa. 64, 68, 153 A. 137, 139; McCown v. Fraser, 327 Pa. 561, 564, 565, 192 A. 674, 676; Ringer v. Finfrock, 340 Pa. 458, 461, 462, 17 A. 2d 348, 350.' . . .": *Kees, Executor v. Green,* 365 Pa. 368, 374, 75 A. 2d 2.

In *Phillips' Estate,* 244 Pa. 35, 43, 90 A. 457, the Court said: "When a will is attacked on the ground of undue influence, 'It is necessary to bear in mind the meaning of the term . . . . . .; as a legal phrase it is used as denoting . . . . . . something violative of legal duty . . . . . . The word "influence" does not refer to any and every line of conduct capable of disposing in one's favor a fully and self directing mind, but to a control acquired over another which virtually destroys his free agency . . . . . . *In order to constitute undue influence*

*sufficient to void a will, there must be imprisonment of the body or mind* . . . . . . fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery, or physical or moral coercion, *to such a degree as to* prejudice the mind of the testator, to *destroy his free agency and to operate as a present restraint upon him in the making of the will.'* (Caughey v. Bridenbaugh, supra, 421; Stokes v. Miller, 10 W. N. C. 241; Miller v. Miller, 3 S. & R. 267; Zimmerman v. Zimmerman, 23 Pa. 375; Tawney v. Long, 76 Pa. 106; Herster v. Herster, supra, 612, 122 Pa. 239; Allison's Est., 210 Pa. 22; McNitt's Est., 229 Pa. 71; Englert v. Englert, 198 Pa. 326; McCauley's Est., 224 Pa. 1, 5; Keller v. Keller, 239 Pa. 467.)." See also to the same effect *Franz Will,* 368 Pa., supra.

The authorities are in accord that, generally speaking, the burden of proving lack of testamentary capacity or undue influence or confidential relationship rests upon the person asserting the same: *Kees, Executor v. Green,* 365 Pa., supra; *Teats v. Anderson,* 358 Pa. 523, 58 A. 2d 31.

But a more difficult question arises in those cases in which a person in a confidential relationship receives the bulk of the donor's or testator's property. If the donor or testator was of weakened intellect, the burden is upon the person occupying the confidential relation to prove that the act or gift or bequest was the free, voluntary and clearly understood act of the other party and that the entire transaction, gift or bequest was unaffected by undue influence or imposition or deception or fraud. If, however, the confidential relationship is not coupled with weakened intellect the burden of proof in will cases is upon those asserting undue influence: *Roberts Will,* 373 Pa., supra; *Ash Will,* 351 Pa. 317, 41 A. 2d 620; *Snedeker Estate,* 368 Pa. 607, 84 A. 2d 568; *Quein Will,* 361 Pa. 133, 145, 62

A. 2d 909; *Phillips' Estate,* 244 Pa., supra; whereas the rule in equity casts the burden of proof upon the person occupying the position of confidential advisor: *Kees, Executor, v. Green,* 365 Pa. 368, (and numerous decisions of this Court therein cited).

In *Phillips' Estate,* 244 Pa., supra, the Court said (pp. 43-44): "Where a person has testamentary capacity, but is so weak physically or mentally as to be susceptible to undue influence, and a substantial part of his estate is left to one occupying a confidential relation to him, the burden is upon the latter to show that no improper influence controlled the making of the will . . .; but in a case where the decedent's testamentary capacity is conceded and there is no evidence of weakened intellect, the burden is upon those asserting undue influence to prove it, even where the bulk of the estate is left to one occupying a confidential relation . . . A testator of sound and disposing mind is entitled to distribute his property as he may see fit without regard to the personal motives or prejudices which influence him (Dean v. Negley, 41 Pa. 312, 316), and when he makes substantial provision in his will for one occupying a confidential relation, the strict legal presumptions that apply to and govern cases of gifts inter vivos under like conditions do not control (Caughey v. Bridenbaugh, supra, 430, 433)."

In *Snedeker Estate,* 368 Pa., supra, the Court said (p. 612): ". . . The rule applicable in will contests is clearly enunciated in Quein Will, 361 Pa. 133, 145, 62 A. 2d 909, where we said: 'Where there is no evidence of *weakened intellect* the burden is upon those asserting undue influence to prove it even though the bulk of the estate is left to those occupying a *confidential relation.* . . . But where there is evidence of *confidential relation* coupled with a *weakened mind,* the burden of proof shifts to proponents.' . . ." See to the same ef-

fect: *Roberts Will*, 373 Pa., supra; *Ash Will*, 351 Pa., supra.

The basis for this diametrically different rule or burden of proof has rarely, if ever, been stated. The basis would seem to be that it is natural and customary for a person to dispose of his property by will, and therefore he is not unlikely to discuss it with the principal beneficiary; whereas it is unnatural for a person to give away a large portion of his property during his lifetime even to one occupying a confidential relationship. Although, to many, the Equity rule will seem the fairer and better rule, it is too late to question or discard the rule which has been so long established and so recently reiterated in will cases.

One other important point remains for consideration. Although the defendants' (or contestants') testimony standing alone, was amply sufficient to justify the jury's finding that the testator lacked testamentary capacity and that the alleged will had been obtained by undue influence, the Chancellor set aside the verdict and entered judgment *non obstante veredicto* in favor of the plaintiff or proponent. The law is clearly established that that was within the authority, power and discretion of the hearing Judge, whether he was sitting as a Chancellor in the Court of Common Pleas or as a hearing Judge in the Orphans' Court, because the verdict of the jury is advisory only and the Chancellor or Judge who sees and hears the witnesses must enter a judgment in accordance with his conscience after and upon a consideration of the entire record: *Stewart Will*, 354 Pa. 288, 294, 47 A. 2d 204; *Shuey v. Shuey*, 340 Pa. 27, 16 A. 2d 4; *Roberts Will*, 373 Pa., supra; *Phillips' Estate*, 244 Pa., supra.

In *Roberts Will*, Mr. Justice STEARNE said (p. 10): ". . . '. . . " 'In every case tried before a jury in which the trial judge sits as a chancellor, the evidence is ad-

298

dressed to him quite as much as to the jury—it must as a whole be judged by him independently of the jury —must satisfy his (legal) conscience as well as the jury—and cannot be rightfully submitted to the jury as a basis of any finding which he would not approve; in a word, he cannot permit the jury to do what he as chancellor (after weighing the evidence in the light of the established law upon the subject) would not do' ": Phillips' Estate, 244 Pa. 35, 42, 90 A. 457, quoting with approval from opinion of Judge ENDLICH in Caughey v. Bridenbaugh, 208 Pa. 414, 415, 57 A. 821, affirmed per curiam.' "

In *Stewart Will,* 354 Pa., supra, Mr. Justice JONES also quoted with approval the same language from *Phillips' Estate,* 244 Pa., supra, and *Caughey v. Bridenbaugh,* 208 Pa., supra, and further said (p. 294) : "We do not agree, however, that, in passing upon the proponents' motion for judgment n. o. v., the court below was required to view the verdict on the basis of the facts and inferences most favorable to the successful party. (Compare Morrish Estate, 156 Pa. Superior Ct. 394, 40 A. 2d 907.) Such is the rule in an action at law where the jury is the sole judge of the facts. But, in the trial of an issue *devisavit vel non,* where the trial judge sits as a chancellor, his conscience must be satisfied with the justness of the verdict on the basis of all of the evidence. If the chancellor is not so satisfied, he may set aside the verdict even though it might otherwise be found sustainable solely upon the facts and inferences most favorable to the verdict. . . ."

The test to be applied by an appellate court in reviewing the entry by a Chancellor or hearing Judge of a judgment *non obstante veredicto* in favor of the proponents of a will following the verdict of a jury on an issue *devisavit vel non,* is not whether the appellate court would have reached the same result, had it

been acting as Chancellor and seen and heard the witnesses, " 'but rather whether a judicial mind, on due consideration of the evidence as a whole, could reasonably have reached the conclusion of the chancellor . . .' ": *Shuey v. Shuey,* 340 Pa. 27, 32, 16 A. 2d 4. See also to the same effect: *Noble's Estate,* 338 Pa. 490, 492, 13 A. 2d 422; *Dible's Estate,* 316 Pa. 553, 554, 175 A. 538; *Roberts Will,* 373 Pa., supra; *Stewart Will,* 354 Pa., supra; *Phillips' Estate,* 244 Pa., supra; or as is sometimes expressed, "the chancellor's decision will not be reversed unless an abuse of discretion on his part appears": *Dible's Estate,* 316 Pa. 553, 175 A. 538; *Doster's Estate,* 271 Pa. 68, 113 A. 831; *Mark's Estate,* 298 Pa. 285, 148 A. 297; *Fink's Estate,* 310 Pa. 453, 165 A. 832.

Applying this test: The Judgment *non obstante veredicto* is affirmed; costs to be paid by appellants.