Elias Will.

Argued November 27, 1967. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Joseph Matusow*, with him *Samuel J. Marks*, for appellants.

*David Weinstein*, for appellees.

OPINION BY MR. CHIEF JUSTICE BELL, March 15, 1968:

William John Elias, a man then in his early sixties, died on *March 29, 1965*, survived by two sisters, Anna and Mary, and two brothers, Samuel and Thomas. William Elias had been engaged in the business of buying and selling rugs and objects of art which had been started by his father. For many years and up to the

time of his death, *Mary and Samuel* participated with William in the conduct of this business. Mary, together with her daughter, lived with William in living quarters located over the business premises.

A writing dated March 9, 1965, purporting to be William's last will, was lodged with the Register of Wills for probate by Mary and Samuel on May 29, 1965. Mary and the scrivener, attorney Alvin M. Chanin, had signed the document as subscribing witnesses. With certain minor exceptions, this writing provided that William's entire estate was to be distributed in equal shares to *Mary and Samuel*. It then expressly stated in Item VIII: "I have made no provision herein for my brother, THOMAS JOHN ELIAS, 301 W. Park Lane, Clifton Heights, New Jersey and my sister, MRS. GEORGE ANTON CALZA, a/k/a ANNA REBECCA ELIAS CALZA, Trieste, Italy and specifically direct that neither of these parties shall take under any provision herein contained nor as residuary legatees under this Will."

Prior to the completion of probate, a caveat was filed with the Register by Anna and Thomas. A hearing was held by the Register, who granted the prayer of the caveat and refused probate of the aforesaid March 9, 1965 writing. The basis of the Register's decision is not clear from the record. In any event, a de novo hearing was held in the Orphans' Court as a result of an appeal taken by Mary and Samuel from the Decree of the Register of Wills. The basic issue before the Orphans' Court was one of forgery. The Chancellor (1) ruled against contestants Anna and Thomas on the most important issue raised by them, namely, forgery, and (2) also concluded (a) that the decedent had testamentary capacity and (b) that the will had not been procured by undue influence. Accordingly, the appeal from the Register was sustained

and the writing of March 9, 1965 was held to be the will of the decedent William John Elias and entitled to probate. Exceptions were filed by Anna and Thomas, which were dismissed by the Court en banc, with one Judge dissenting. This appeal followed.

With respect to the scope of review in this type of case, we reiterated in *Kadilak Will,* 405 Pa. 238, 244, 174 A. 2d 870, the applicable tests: "Upon appeal to this Court the chancellor's decision will not be reversed unless there appears to have been an abuse of discretion or a fundamental error in applying the correct principles of law: Molden Will, 387 Pa. 484, 500-501, 128 A. 2d 568; Williams v. McCarroll, 374 Pa. 281, 298-299, 97 A. 2d 14, and numerous cases cited therein; DeLaurentiis's Estate, [323 Pa. 70, 186 A. 359]; Masciantonio Will, 392 Pa. 362, 141 A. 2d 362."

Moreover, "on appeal, it is not within our province to assess the credibility of the testimony. Our scope of review is limited to a determination of whether or not the findings of fact are supported by sufficient, competent evidence, and whether or not the court below committed an error of law or abused its discretion: Abrams Will, 419 Pa. 92, 213 A. 2d 638." *Zeedick Will,* 421 Pa. 44, 46, 218 A. 2d 755.

The subscribing witnesses to the will were Mary and an attorney, Alvin M. Chanin. Chanin testified that he first met William (the decedent) in 1959, when he purchased some rugs from him but that he had not rendered any legal services to William until some time in February of 1965. At that time, William called Chanin on the telephone and said that he wished him to draft a will and to collect a few small claims; that William discussed with him over the telephone the provisions of the proposed will; and that upon his (Chanin's) return from a brief trip to Europe he went to William's home one evening with copies of the will

which he had prepared and which William signed in his presence and in the presence of Mary. Chanin further testified that he discussed the provisions of the will with William that evening, just prior to its execution, and that the date (March 9, 1965) was inadvertently omitted from the will but was inserted, at Chanin's direction, by Chanin's secretary at his office a day or so later; and that he (Chanin) kept the original will.

Chanin also testified that he had represented Mary at a domestic relations hearing in March of 1965 but because he was not asked to represent William's estate, he was unwilling to turn over William's will until he was paid for his services in the preparation of William's will and also for his above mentioned services to Mary. He further testified that he was paid $185 on April 12, 1965, at which time he delivered William's will to the present attorney for the estate, but he refused to appear at the office of the Register of Wills for the purpose of attesting to the signature of the decedent, until subpoenaed for this purpose.

Mary testified that she saw her brother William sign the will on the evening of March 9, 1965; that she had nothing to do with arranging for the preparation or execution of the will; that she didn't know she was going to be a witness to the will until she was asked to do so by William during Chanin's visit that evening; and that she did not know the contents of his will before that evening.

In support of the subscribing witnesses, the proponents produced (1) a handwriting expert who testified that in his opinion the signature on the will was genuine and (2) several disinterested witnesses who testified that the decedent, during his lifetime, told them that he had an ill will toward Thomas and Anna, the contestants. Emma Miele, a business acquaintance

of William's for close to twenty years, testified that William had told her that Thomas and Anna "would never get a penny of his estate of any kind because they had been untrue to him in every way. They had caused a lot of heartaches and ill feeling in the family." She also testified that she had observed "terrible" arguments between William and Thomas. A former neighbor, John Bowles, testified that he had known William ever since Bowles was about seven or eight years of age and described William's attitude toward Anna and Thomas as "hostile." Another neighbor, Margaret Mette, testified that she had known William since 1943 and that William "loathed" Thomas and Anna. This line of testimony was further confirmed by Dr. Ernani DiMassa, who had known William for over fifteen years and who had admitted him to the St. Agnes Hospital in March of 1965, where he died following the amputation of his leg. Dr. DiMassa testified that he had a long conversation with William after his admission to St. Agnes Hospital during which the decedent bitterly complained about certain members of his family and said he was not going to give them one cent.

Contestants were faced with the aforesaid testimony of the two subscribing witnesses that the will was executed by the decedent in their presence, as well as the testimony of the additional witnesses hereinabove summarized. Contestants first contend that the testimony of the subscribing witnesses should not be believed. As to Chanin, they say that he was an interested party (a) because he was "defending his handiwork;" and (b) because Mary was his client at the time the will was executed; and (c) because of his lack of memory of certain details regarding the preparation and execution of the will and his failure to retain all of his work papers.

With respect to Mary's testimony, contestants argue that she was unworthy of belief because (1) she was evasive; and (2) the will gave her a one-half interest in the decedent's estate; and (3) (a) by reason of her long association in business with the decedent she had an opportunity to study his signature, and (b) had written the body of business checks for William's signature for approximately two months before his death, and (c) consequently she must have forged William's name to the will.

Contestants proved that at the time of the execution of the will William was very ill with diabetes, and that gangrene had reached a point which necessitated the amputation of his leg. From this fact, they argue that William's poor physical condition would have precluded his signing his name on March 9, 1965 with the firm, bold handwriting that appears on the will. However, none of contestants' witnesses testified that William could not have signed his will in a firm manner on March 9, 1965, nor did they affirmatively prove that William did not sign his will on that date. Contestants also produced a handwriting expert whose testimony implied that William's name was forged, but his testimony was not considered convincing by the Chancellor.

The Court en banc characterized Chanin as a "hostile" witness on the basis of his disappointment in not being asked to act as attorney for the estate. We need not decide whether he was a "hostile" or even an interested witness, because even if interested his testimony would be admissible. *Pochron Will*, 367 Pa. 306, 80 A. 2d 794. Moreover, contrary to contestants' contention, Mary's interest in the estate would not preclude her from testifying as a subscribing witness, nor would her interest alone discredit her testimony. *Pochron Will*, 367 Pa., supra. We note that Chanin's and

Mary's testimony was believed by the Chancellor and affirmed by the Court en banc.

Contestants' contentions and arguments are based principally upon surmise, conjecture and conclusions, and the failure of the Chancellor to draw the same inferences and conclusions from the testimony as they did.

In *Kadilak Will*, 405 Pa., supra, we said (page 243): "The party relying on fraud or forgery has the burden of proving the facts upon which the alleged fraud or forgery is based and these facts must be proved by evidence which is clear, direct, precise and convincing: Molden Will, supra; Petro v. Secary Estate, 403 Pa. 540, 543, 170 A. 2d 325; see also: Williams v. McCarroll, 374 Pa. 281, 292, 97 A. 2d 14."

Furthermore, "Suspicion and conjecture do not take the place of evidence: Rosenthal's Estate, 339 Pa. 488, 15 A. 2d 370; Sellers & Co. v. Clarke-Harrison, Inc., 354 Pa. 109, 46 A. 2d 497; Lasky v. Paprocki et ux., 363 Pa. 50, 68 A. 2d 593." *Pochron Will*, 367 Pa., supra (page 311).

Finally, the opinion evidence of an expert is, in cases of forgery, entitled to very little weight and cannot prevail against positive evidence of actual facts by witnesses whom the Chancellor considers credible. *Kadilak Will*, 405 Pa., supra, 243; *Pochron Will*, 367 Pa., supra.

Considering all the evidence in light of the foregoing authorities, it is clear that neither the Chancellor, who saw and heard the witnesses, nor the lower Court abused their respective discretion or committed a fundamental error of law.

Decree affirmed; appellants to pay the costs.