**Miller  Will**

Before Bolger, Lefever, Saylor, Shoyer and Silverstein, JJ.

*John J. Cahill, Jr.,* for exceptants.

*Daniel Sherman,* contra.

BOLGER, J., January 6, 1971.—This is strictly a probate proceeding. The caption should not be "Estate of Dorothy A. Miller, Deceased," but "Dorothy A. Miller Will," and such substitution is hereby imposed.

This case involves the validity of three testamentary writings of a mother wherein her daughter was disinherited. The daughter contests the probate of all three alleged wills admittedly containing testatrix' signature and dated August 4, 1967. The beneficiary proponents include part-time domestics and a sometime handyman (second cousin) in Mrs. Miller's household, all of whom had been paid for their past services. The contestant alleged that Mrs. Miller lacked testamentary capacity and was subjected to undue influence. The trial was before Judge Shoyer and a jury upon certification by the register of wills that substantial issues of fact were involved. The jury sustained both charges as to all three documents and the chancellor approved the jury's findings in a brief memorandum. Exceptions thereto were taken and a new trial or judgment n.o.v. requested.

The statement of questions involved in exceptants' brief and at argument are limited to three in number and therefore all other exceptions are regarded as withdrawn.

The three questions are:

1. Did the weight of the evidence sustain the finding of the jury that decedent was of unsound mind at the time of the execution of her will and was such evidence sufficient to sustain contestant's burden of proving undue influence?

2. Did the course of questioning on crossexamination by contestant's counsel violate fundamental fairness and were not many of his specific questions prejudicially harmful to proponents?

3. Was it not error to include the name of Katherine Greeby in the special interrogatories to the jury pertaining to undue influence?

The chancellor found: "The evidence produced before the jury has conformed to the Chancellor's ap-

proval of the issues. The Chancellor accepts the special verdict of the jury and now expresses his satisfaction with the justness thereof on the basis of all the evidence."

The scope of our review of the chancellor's action is limited to determining whether his findings were based upon legally clear, competent and sufficient evidence or whether he committed an error of law: Dettra Will, 415 Pa. 197; Holtz Will, 422 Pa. 540; Abrams Will, 419 Pa. 92.

The verdict of the jury is advisory only: Orphans' Court Act of August 10, 1951, as amended, Act of July 14, 1961, P. L. 610, 20 PS §2085.745(c); Abrams Will, supra. Probably the most important present facet of this case is the credibility of the witnesses. This was the function of the chancellor and a court en banc can properly disregard the chancellor's finding only in a clear case: Roberts Estate, 350 Pa. 467; Belmont Laboratories, Inc. v. Heist, 300 Pa. 542. It is our responsibility to now determine whether he was capricious and arbitrary. We cannot arrogate to ourselves the determination from the cold printed record whether we would have decided differently than the chancellor who saw and heard the witnesses in the determination of whether the presumption of testamentary capacity was overcome by clear, strong and convincing evidence (Dettra Will, supra, 201), or whether the finding of undue influence is supported by credible evidence or that the chancellor committed error in refusing the withdrawal of a juror because of improper crossexamination by counsel for contestant which allegedly deprived the proponents of a fair trial and the inclusion of Mrs. Greeby among those who might have exercised undue influence.

The exceptants cite the principle of law that when a will drawn by a lawyer scrivener and witnessed by

two subscribing witnesses is established, the burden of proving testamentary incapacity or undue influence "can be sustained only by clear and strong or compelling evidence . . ." It is especially true when corroborated by an attending physician: Higbee Will, 365 Pa. 381, 382. As a part of their motion for judgment n.o.v., the proponents cite Roberts Will, 373 Pa. 7, 17, ". . . 'In Aggas v. Munnell, 302 Pa. 78 . . . , the law is well stated: "Neither old age, nor its infirmities, including untidy habits, partial loss of memory, inability to recognize acquaintances, and incoherent speech, will deprive a person of the right to dispose of his own property . . ."'" Also cited is Lawrence's Estate, 286 Pa. 58, which added debility of body, peculiar beliefs and opinions, incapacity to do business or partial failure of memory.

Respecting testamentary capacity, the statement quoted in Protyniak Will, 427 Pa. 524, is well established. The elements involved are intelligent knowledge regarding those who are the natural objects of his bounty, of what his estate consists and of what he desires done with it even though his memory has been impaired by age or disease. To this must be added, of course, that he must be aware of the nature of his act, i.e., that he is disposing of his property effective at his death: Paul Will, 407 Pa. 30.

The record provides certain incontrovertible facts which could not be ignored by the judge and jury nor denied by the proponents and they are: Dorothy A. Miller, testatrix, was 59 years old when she died on August 7, 1967, from a self-administered overdose of drugs. She had lived with her daughter, Claire, for 30 years. While pregnant with Claire, she suffered severe injuries in an automobile accident which permanently paralyzed her on the right side, her arm being useless and braces supported her right leg. There was also a

severe trauma to the left side of the brain controlling the decision-making power and other functions. Testatrix had separated from her husband in 1960 and was finally divorced in 1966, at which time the parties executed a deed for their home to Mrs. Miller and her daughter, Claire, as joint tenants with right of survivorship. Mrs. Miller was represented by counsel in her divorce action. The same counsel also prepared cross wills for Mrs. Miller and Claire in 1962. He was not the scrivener in the instant case.

Mrs. Miller's married life had been marred by her husband's heavy drinking. They lived in a constant state of turmoil, and it was in 1960 that Mrs. Miller slashed her husband's wrists.

Testatrix was in and out of the following hospitals from 1952 to 1966: Roxborough Memorial Hospital on seven occasions with referrals therefrom to Fairmount Farms, Eastern Psychiatric Institute and Magee Memorial Hospital. She was also a patient at Hahnemann Hospital. Fairmount Farms and Eastern Psychiatric Institute are institutions for nervous disorders; Magee Memorial Hospital specializes in physical and other forms of rehabilitation, in Mrs. Miller's case, walking and speech therapy. In 1959 and 1960, Mrs. Miller took overdoses of drugs. The question of attempted suicide was raised in the record without objection. The hospital records from most of these institutions refer to dyaphasia and aphasia, speech and walking as well as other physical defects.

Mrs. Miller had been a bookkeeper at the family trucking business of Atkinson & Co., in Roxborough, in which she held a one-third interest, as well as a one-fourth interest in the building in which the business was conducted. Following her nearly fatal automobile accident about 1937, Mrs. Miller learned to write with her left hand and continued her busi-

ness activity. However, following the two incidents of hospitalization resulting from taking overdoses of drugs she was rendered incompetent to conduct business. Nevertheless, Claire continued to take her to the office every day where Mrs. Greeby gave her old records to copy, a useless function, for therapeutic purposes only. About 1966 this occupation ceased and she was dropped from the payroll of the company. In 1958, in order to insure family ownership of the company, decedent, Mrs. Greeby and their brother, who were the owners of the other two-thirds of the business, entered into an agreement restricting the sale of the stock. Early in 1967, Mrs. Greeby attempted to effectuate the purchase of Mrs. Miller's shares in accordance with the 1958 agreement but she was unsuccessful because of Claire's opposition and her refusal to turn over the stock certificates in her possession.

The events associated with the drafting of the disputed documents took place during the critical period, July 28, 1967, to August 7, 1967, during which decedent's daughter was married and was on her honeymoon. The testimony of the proponents is that while Claire was on her honeymoon decedent was driven one evening to Mrs. Greeby's home by a niece, Betty Ann Koontz. Mrs. Greeby testified this arrangement was preferable to meeting at decedent's home because she was afraid Claire might return from her honeymoon. On the way home, Mrs. Miller is alleged to have stated that she was going to change her will, whereupon the niece suggested the names of two of the domestics as beneficiaries. The next day, Mrs. Miller was taken to the office of the attorney, Francis E. McGill, who testified that decedent discussed with him the stock purchase contract and Claire's resistance to the transfer. The title to the home was also discussed. The attorney visited Mrs.

Miller the next evening, at which time he was handed a signed memorandum in the handwriting of testatrix (exhibit P-3) in the presence of Harry Preston, a principal beneficiary, while two other beneficiaries were in the house. From this, the attorney prepared a handwritten will (exhibit P-1) which he suggested she sign in the presence of her physician. At the same time, he promised to prepare a typewritten will when he returned to his office. The next day the scrivener had a typewritten will prepared (exhibit P-2) and had it delivered to decedent's home. Dr. White, whose signature appears on P-1 and P-2, admitted that P-2 was delivered to him outside the presence of decedent and with her signature affixed. John McGill, brother of the scrivener, who delivered P-2, was also a subscribing witness.

Exhibit P-3 would appear to be the crucial document in this case because the evidence clearly shows that it was the foundation for exhibits P-1 and P-2 and the jury might well have considered it so. According to the testimony of the contestant-daughter, Claire, and corroborated by at least two others and partially by Mrs. Greeby, proponents' witness, Mrs. Miller for a year or more prior to the execution of the wills had such difficulty with her speech that she could never finish a sentence and that her writing consisted solely of copying from something else; that she was incapable of reducing a mental composition, thought, or idea to writing. Thus, it was well within the bounds of reason for the jury to have concluded that, decedent being so incapacitated, P-3 was necessarily the brainchild of someone else. If the proponents' witness, Mrs. Greeby, can admit that she employed decedent in the useless task of copying old records, it is not too difficult to translate that into a situation wherein decedent was cajoled, wheedled or otherwise induced into copying

P-3 from outside sources. Certainly, it was within the bounds of reason for the jury to have come to that conclusion. Exhibit P-3 was never properly explained as the independent act of Mrs. Miller. The scrivener stated that it was handed to him by Mrs. Miller in the presence of Harry Preston, a principal beneficiary. The jury also had before it the testimony of Dr. Robert L. Catherman, forensic pathologist for the City of Philadelphia, who performed the autopsy on Mrs. Miller's body, and that of Dr. Jack Weinstein, a psychiatrist, both of whom, in response to statements of fact, testified that they could render an opinion as to whether or not Mrs. Miller was possessed of a sound mind at the time of the execution of the instruments. To those questions they concluded that she was not of sound mind and the jury apparently accepted their opinion.

The contestant's impartial witnesses as well as Claire, the contestant, were not discredited on cross-examination on any material point, whereas the record discloses evidence which could have, in the minds of the jury and the chancellor, reduced the weight of that of proponents' witnesses. Some illustrations follow. Dr. White, the personal physician for many years to Mrs. Miller, a witness to two of the instruments (one of which was signed outside of his presence) and a witness to her testamentary capacity, did not know of her admission to Hahnemann Hospital nor to Magee Memorial Hospital; that he could not account for the empty bottle of drugs bearing date of August 2, 1967, with his name on it and found on Mrs. Miller's bedside table following her death on August 7, 1967. Dr. White had previously testified that the last prescription he wrote was on July 18, 1967, and that the effect of those drugs would have worn off by the time of the execution of the will on August 4, 1967. Preston, the principal beneficiary, was present during

and after the production of exhibit P-3 and its presentation to the scrivener. In addition, Preston's credibility was subject to attack in the testimony of Mr. Stimmler, the heating engineer, who was admonished by Preston not to talk to testatrix because she "might not have all her marbles." John McGill, brother of the scrivener and a subscribing witness to P-2, failed to testify that Mrs. Miller was possessed of testamentary capacity.

"Confidential relation is not confined to any specific association of the parties; it is one wherein a party is bound to act for the benefit of another, and can take no advantage to himself. It appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed": Leedom v. Palmer, 274 Pa. 22; Hamburg v. Barsky, 355 Pa. 462; C. J. S. 352, §15 A.

"While undue influence is subtle, intangible and merely psychic in its effects, so that its existence cannot be detected, weighed or measured by instruments of science, nevertheless human experience can—and in a case such as the present must—recognize it as the causative factor which linked the execution of this highly unnatural will to the circumstances preceding and attending it . . .": Freed's Estate, 327 Pa. 572.

In Page on Wills, at section 15.9, it is stated:

"The undue influence is generally exerted by the beneficiary under the will; but this is not necessary if undue influence is exerted by one who is not a beneficiary under the will, the will which is caused thereby is as invalid as if the influence were exerted by one of the beneficiaries . . . Undue influence may be exerted by one who was not present, in person, at the execution."

Proponents' witnesses, the sister and niece respectively, admitted a discussion with decedent about her will on the day she visited the sister and that, coupled with the admitted animus of Mrs. Greeby for Claire and the suggested legatees by Betty Ann Koontz, could very well have been accepted by the jury and chancellor as the influence which inspired this highly unnatural will.

In view of the interest of Mrs. Greeby in the ultimate value of this estate, that is, to one who would be more amenable to the sale of the Atkinson stock to her, her only substantial asset, we think the chancellor was quite correct in including her in the special interrogatory to the jury.

The questions propounded by the contestant's counsel on crossexamination with respect to possible meretricious relations between Preston, the legatee, and the contestant were in extremely poor taste and, without more, were not shown to be relevant. However, any damage would reflect as much upon the contestant as the proponents. While the principle of law is generally to the effect that such questions, having no direct relation to the issue, are grounds for a new trial, nevertheless where in a particular case the questions are sui generis, this is not a case where it should be applied because of the overwhelming evidence, and any damage was shared equally by the contestant.

"The general rule is that a motion to withdraw a juror and continue the case, upon the ground of objectionable remarks made by counsel in addressing the jury, is addressed to the sound judicial discretion of the trial court, and its refusal of the motion is reviewable only for abuse of discretion . . .": Lopresti v. Sulkin, 49 Pa. Superior Ct. 417.

Paraphrasing the court in Commonwealth v. Striepeke, 32 Pa. Superior Ct. 82, we cannot say, as a

matter of law, on an inspection of the record as presented to us, that the proponents were unduly prejudiced by the chancellor's refusal to withdraw a juror.

The proponents here might well have benefited more than they were entitled to on two phases of the applicable law. The record does not disclose that they were explained to the jury. The first is that while the law does not mandate that a parent provide for a child by his will or ascribe a reason for a failure to do so (and the proponents' evidence suggests three reasons in this case, namely, decedent's objection to the daughter's marriage, dissatisfaction with respect to the title to real estate, and the daughter's obstruction to the stock sale), nevertheless, along with the instructions as to presumption of testamentary capacity and lack of undue influence which were fully explained to the jury, these principles more properly might have been balanced by a statement of the importance to be attached to the unnatural character of this will. As stated in Thompson Will, 387 Pa. 82, at page 87:

"In Williams v. McCarroll, 374 Pa. 281, 97 A. 2d 14, the court restated the principles which are now well and clearly established: ' ". . . It is . . . the rule in Pennsylvania that in every case in which the question of testamentary capacity and the allegation of undue influence is presented to the court for determination, it is important to examine the disputed document itself to ascertain whether the testamentary scheme is natural and reasonable and in harmony with the family background" ' . . ."

The second favorable turn for the proponents has to do with undue influence, the burden of which was cast by the chancellor upon the contestant. The other side of the coin should just as properly have been exposed to them; they might well have placed the burden

upon the proponents. Here, there was sufficient evidence from which a finding that Mrs. Miller had the requisite weakness of mind as related hereinbefore, as well as the second requisite of confidential relationship if the testimony of the contestant's witnesses be accredited (and supported in large part from some of proponent's witnesses), the beneficiaries of this will were not only household employes of this very ill woman, but handled practically all of her financial and personal matters during the two critical periods immediately preceding and during the time the alleged wills were executed, namely, when the daughter, Claire, was hospitalized from December 1966, to April 1967, and when she was married and on her honeymoon from July 28, 1967, to the date of decedent's death. From this relationship of proponents to Mrs. Miller, we have the basic elements consistent with a finding of confidential relationship.

We are all satisfied that this was a fair trial and find no error in the record. The contestant successfully carried the burden of proving lack of testamentary capacity and of undue influence by clear, strong and compelling evidence. The record is free from legal error, abuse of discretion or capricious disbelief of competent or credible evidence.

All exceptions are dismissed. The verdict of the jury and the decision of the chancellor are sustained.