## Daroff Estate

Before Klein, P. J., Bolger, Lefever, Saylor, Shoyer and Burke, JJ.

*Lawrence J. Richette* and *Lester J. Schaffer*, for contestants.

*Harry D. Sporkin* and *Jacob B. Abrams*, for respondents.

BOLGER, J., February 21, 1964.—Max A. Daroff died September 12, 1960. His will, dated November 21, 1958, was admitted to probate and letters testamentary were granted to Esther Glantz on September 14, 1960. On August 29, 1962, Lewis A. Darrow, a brother, took an appeal from probate and after citation to show cause why the will should not be set aside on the grounds of forgery and alias citations, a responsive

answer was filed. The sister and nephew were joined as parties. The sister became a contestant and was represented by counsel; the nephew did not appear.

The will directed that testator's body be cremated; that there be no public viewing, no religious ceremony and that his ashes be scattered. He expressly disinherited his sister and gave his entire estate to Esther Glantz, whom he named as executrix. Should Esther Glantz predecease him, he gave 10 percent of his residuary estate to Morris Paul Baran, if he were then still associated with him in the practice of law, and gave the balance of his estate in equal shares to Temple University Law Alumni Association and American Cancer Society. He directed that Morris Paul Baran be engaged as counsel for the executrix.

Prior to the trial, counsel stipulated that the case should be tried by a jury; that a d.v.n. be waived and that the issue to be presented was the genuineness of the signature on the probated will.

Testimony was received for almost two weeks, following which the jury was unable to reach a unanimous verdict. The jury was discharged. The hearing judge, as chancellor and in accordance with section 745 of the Orphans' Court Act of 1951, as amended, entered a finding in favor of the will.

The uncontradicted testimony of the subscribing witnesses was that testator signed his will in his office in the presence of the scrivener, Mr. Baran, an accountant, Mr. Abrams, and a secretary, Mrs. Belov. They unanimously testified that testator signed the original at the end thereof, also on the margin of the first page of the original and at the same time signed two carbon copies in the same manner and all three witnesses subscribed their names.

Mr. Baran testified that he was the scrivener. He stated that, at testator's request, the will was not typed in the offices which testator and Mr. Baran shared with

at least two other lawyers and Mr. Abrams, an accountant. He said the typist was his sister, a legal secretary employed in another law office, and that the typing was done on her own portable typewriter at their home. She was later called and corroborated this fact.

Mr. Baran further stated that there had been preliminary drafts submitted by him to testator, who made corrections or directed that corrections be made before the final draft was completed.

It was testified that testator thereafter left his suite in the Finance Building and occupied space in the Land Title Building with other lawyers. Mr. Baran remained in the office in the Finance Building. Mr. Daroff informed one of his new associates, Mr. Strauss, that his will was in his filing cabinet. After Max Daroff died, Mr. Strauss found the will where testator had advised him it was kept. He called Mr. Baran, who then came to the Land Title offices. These facts were verified by Mr. Somerson. Both of these gentlemen are members of the bar in good standing, and their testimony was neither contradicted nor in any way impeached, although all of the witnesses were subject to most extensive cross examination.

During the contestants' case, most of the evidence produced by them came from the lips of the sole beneficiary, the scrivener, and the other subscribing witnesses, all of whom were called as witnesses for the contestants. The testimony elicited was not contradicted by any direct evidence, and the hearing judge finds that the contestants are bound by their testimony.

When Mr. Baran was testifying, he was asked to explain a $10,000 fee he had received from the beneficiary in addition to the regular fee of $7,500 for his services to her as executrix. This question opened a Pandora's box of testimony. Excepting for the importance of an attempt to disprove the credibility of the

contestant-called witnesses, Glantz and Baran, the testimony which followed developed the following facts:

This will contest was commenced by Lewis Darrow, testator's brother. He had charged the sole beneficiary under the will with murdering his brother, and Darrow threatened to kill her. The record reveals that practically all of the law enforcement agencies of this city, including the district attorney's office, and a psychiatrist, after two months of investigation, called a conference at which Lewis Darrow and his then attorney were present. It was then decided that Darrow's charges could not be sustained, that decedent died a natural death. The record revealed that not only the beneficiary was cleared of any suspicion, but also that Darrow was in need of psychiatric care. Darrow withdrew his informal charges.

The trial judge held hearings outside the presence of the jury, at which time, with the consent of both Darrow and his attorney, the trial judge found Darrow incompetent and appointed Lester Schaffer as his guardian ad litem. The trial judge then held another hearing on contempt charges, based primarily upon affidavits that Darrow while the case was pending but before the trial began, made a statement in the office of the clerk of this court that he intended to "settle this case with a forty-five".

There was no evidence presented, either direct or circumstantial, to prove the alleged forgery, and there was no direct evidence of any element of fraud relating to the preparation, execution and retention of the will.

Kadilak Will, 405 Pa. 238, correctly states the law, page 243:

"The party relying on fraud or forgery has the burden of proving the facts upon which the alleged fraud or forgery is based and these facts must be proved by evidence which is clear, direct, precise and convincing: Molden Will, supra [387 Pa. 484]; Petro v. Secary

Estate, 403 Pa. 540, 543, 170 A. 2d 325; see also: Williams v. McCarroll, 374 Pa. 281, 292, 97 A. 2d 14.

"Moreover, opinion evidence of an expert, whether he be a doctor or any other kind of expert, is, in cases of forgery, undue influence, mental capacity and insanity, of very little weight and cannot prevail against direct factual credible evidence: Pochron Will, 367 Pa. 306, 80 A. 2d 794; Peterman Will, 367 Pa. 302, 80 A. 2d 792; Porter's Estate, 341 Pa. 476, 19 A. 2d 731; Snedaker Estate, 368 Pa. 607, 84 A. 2d 568; Sturgeon Will, 357 Pa. 75, 53 A. 2d 139; Cookson's Estate, 325 Pa. 81, 88, 188 A. 904; De Maio Will, 363 Pa. 559, 563, 70 A. 2d 339; Commonwealth v. Woodhouse, 401 Pa. 242, 259, 260, 164 A. 2d 98."

The testimony of the handwriting expert was admissible under the act of assembly, but, in the absence of proof of the nature required in the cited case, it must be given the least weight of any of the evidence in this case. The opinion cannot be considered as substantive evidence.

The hearing judge, as chancellor, finds that there was no substantial dispute of a material fact which would require a verdict of the jury. His conscience as chancellor would not permit him to sustain any verdict against the will or a fortiori to authorize a new trial because of the disagreement of the jury. Hence, the following

*Decree*

And now, February 21, 1964, after a full trial, the appeal from the probate of the will of Max A. Daroff is dismissed, and the record is remitted to the office of the register of wills.

Opinion sur Exceptions

SAYLOR, J., June 12, 1964.—In this will contest involving an estate of nearly $150,000, the moving spirit is Lewis A. Darrow, an older brother of Max A. Daroff, a member of the bar, who died in his fifties, unmarried,

of a heart attack, on September 12, 1960. Lewis, a member of the bar for 30 years, was for some time an assistant city solicitor for the City of Philadelphia. He is familiar with the processes of the law. But he waited until August 29, 1962, to appeal from the probate of decedent's will. That was 16 days before the end of the 2-year period allowed by the statute. Letters testamentary had been granted to Esther Glantz, now Mrs. Gross, the sole legatee, on September 14, 1960.

Prior to the trial of the appeal, Darrow employed at least five attorneys, of whom Mr. Richette was one. Mr. Richette withdrew his representation, with court approval, and became counsel for Mrs. Samuels. Mr. Schaeffer became the counsel for Darrow at the request of the Philadelphia Bar Association.

Following a series of postponements over a period of months at the contestants' request, trial on the sole charge of forgery began on February 4, 1964, before Judge Bolger and a jury.

The probated will vested the entire estate in Esther Glantz, a "girl friend" of decedent, provided she survived him. Failing her survival, one-tenth of the residue was willed to Morris Paul Baran, provided he was associated as a lawyer with decedent at the latter's death, and the balance to two charitable institutions, Temple University Law Alumni Association and American Cancer Society. Under no circumstances was testator's sister, Ina Samuels, ever to receive any part of the estate. The will directed that the body be disposed of by cremation and the ashes "discarded". Religious ceremonies or other ceremony of any kind and any viewing of the body were specifically prohibited. Testator directed that Baran was to act as counsel for the estate and that Miss Glantz was to serve as executrix.

Darrow's conduct following decedent's death was bizarre and extraordinarily vindictive. He charged

Esther Glantz with murdering decedent by giving him arsenic, demanded that his brother's body be buried instead of cremated, and insisted that a memorial or religious service be conducted despite the provisions in the will to the contrary. He filed suit in the common pleas court to prevent the cremation of the body and discarding of the ashes, and then withdrew it. The cremation was carried out, and there was no autopsy. Darrow shouted "murder" and complained far and wide that he could get no action on his charge from the police and the District Attorney's office. These two departments and the Federal Bureau of Investigation, after thorough efforts to run down the complaint filed October 24, 1960, at a meeting demonstrated to Darrow that his charges were groundless. The alleged poison in women's heel guards found by him in his brother's automobile and turned over to the police was, on the same day, proved to be not arsenic but common dirt. The authorities advised Darrow to consult a psychiatrist, whereupon he stated that he had done so.

Darrow later denied that he had threatened to shoot Miss Glantz in the stomach, a threat that caused the police to advise her to leave the city. He announced in the office of the clerk of this court that he intended to "settle this case with a forty-five". He wrote threatening letters to the subscribing witnesses to the will shortly before the trial. During the trial, he was declared incompetent and was committed to the Philadelphia State Hospital for observation under the care of a psychiatrist. His attorney, Mr. Schaffer, was appointed guardian ad litem for him. Subsequently, Lewis A. Darrow was released.

The trial lasted nine days, at which 33 witnesses testified and 83 exhibits were admitted. The record comprises 1,430 pages, including Judge Bolger's charge and subsequent instructions.

The jury failed to reach a verdict. Thereupon, the trial judge ruled that the signature to the will was genuine and that the probated will was the last will of Max A. Daroff. On February 20, 1964, he entered a decree formalizing such action. On February 21, 1964, he filed an opinion and decree, dismissing the appeal and remitting the record to the register of wills.

The contestants filed exceptions to the decree and also a motion for a new trial with the usual reasons and eight additional reasons. Argument was heard by the court en banc on May 18, 1964. Additional reasons, 2 to 7 inclusive, relate to the charge and instructions to the jury and are, therefore, irrelevant in view of the discharge of the jury and the trial judge's decree. It is his decision that is before the court for review. The only question to be answered is this: Was there evidence before the chancellor sufficient to justify his finding that the will was genuine?

## 1. *The Court's Witnesses*

At trial, the probate record was admitted and the three subscribing witnesses, including the scrivener, were called to testify. During the taking of the testimony of each one of the three, the other two were sequestered.

Morris Paul Baran, a member of the bar since 1957, testified that he was a law associate of decedent from June 1958, to July or August 1960. Decedent told him to write for him a simple will bequeathing his estate to Esther Glantz, then unknown to Baran who thought she was Daroff's sister. Baran worked on the will under prodding, and when he presented it to decedent, the latter, on two occasions, made changes in it. He told Baran to include provisions for disinheriting Mrs. Samuels, for the cremation of his body, for the bar on religious services, and for Baran to receive 10 percent under certain conditions. He instructed Baran not to have the will typed in the law office as he did not want

his law associates to know anything about it. Baran asked his sister, a stenographer, to type the will at their home. After delay, due to her preparation to be married, she did so.

On November 21, 1958, the will was in final form for execution. Testator called into his office Baran and two office associates; Mrs. Esther Belov, a secretary to Harry D. Sporkin, Esq., and Benjamin B. Abrams, an accountant for 30 years, brother of Jacob B. Abrams, Esq., who is cocounsel with Mr. Sporkin for the proponent. Mrs. Belov testified that decedent said: "I want you to witness my will." Mr. Abrams testified to the same effect.

While all four persons were present in the room, the will was executed. Wearing a collar used by those who suffer neck injuries, and standing at a desk that had been elevated by four equally high supports for the four legs, testator dated the will, signed his name at the end thereof and then signed his name on the margin of the first page. Thereupon, Esther Belov, Abrams and Baran, in that order, all signed their names and wrote their addresses on the second page following the witness clause. After that, testator performed the same operation on a carbon copy of the instrument and the subscribing witnesses, as before, wrote their names and addresses as witnesses. Then all four persons signed their names on a second carbon copy of the instrument in identical manner. The result was that testator had signed his name twice on the original and on each of the two carbon copies of the will and each of the three witnesses had signed their names and written their addresses on the original and two carbon copies. Following the execution of the papers, testator took them and placed them in a manila folder and put the folder in one of the filing cabinets under the letter "D". He said to Baran: "You know where my will is in the event anything happens to me."

The testimony of the court's witnesses given on direct examination was meticulously and painstakingly tested by contestants' counsel. Despite a most thorough, and at times tedious, cross examination, the testimony was not in any degree whatever weakened or refuted. It was clear, unequivocal and positive in nature. On all essential facts, the three court's witnesses were in agreement.

No evidence of any kind was presented by the contestants to contradict, impeach, rebut or cast any shadow of suspicion on what Morris Paul Baran said about the preparation of the will and its execution.

In cross examination, Baran stated that he did not see the will or the executed copies of it again until after the death of testator. In July or August 1960, in testator's absence and at his instruction, Baran moved testator's files and office furniture from the Finance Building to the Land Title Building, where testator and four or five other lawyers associated themselves together in a suite leased by two of the number. Baran remained in the Finance Building.

The circumstance that there was not complete agreement by the court's witnesses on such inconsequential matters as on which side of the desk they stood when signing their names, or what manner of pen each and every one used, is of no importance in view of their positive and uncontradicted testimony on vital matters. Nor is any consideration due the contestant's effort to show that the court's witnesses are interested parties. Baran's contingent bequest is without value as Miss Glantz is living and he was not associated with decedent as a lawyer at the time of decedent's death. That he and his partners have been paid a fee for representing the estate is not exceptionable. That Mrs. Belov was employed by decedent's office associate is of no import. That Mr. Abram is an accountant, that he

has received a fee for services, and that his brother is a lawyer in the case, is not significant.

It is beyond reason to expect (1) that persons of the character and position of the subscribing witnesses would commit perjury in order to advance the interests as legatee of a woman they scarcely knew, and (2) that the scrivener, a lawyer at the outset of his career, would testify and deceive judge and jury to aid a woman unknown to him when he drafted the will in which she is named as sole legatee.

In the face of this evidence and that of the other two subscribing witnesses, evidence which is direct and credible, a finding of forgery based on a handwriting expert's opinion testimony could not be sustained. In Snedecker Estate, 368 Pa. 607, 609 (1951), the Supreme Court said, page 609:

"Opinion evidence by an expert is, of course, admissible but as we said in Henry's Estate, 276 Pa. 511, . . . 'opinion evidence, standing alone, as it did, would not sustain a finding of forgery, in the face of the direct and credible evidence . . .' "

Because of the factual, uncontradicted and unimpeached testimony of the subscribing witnesses, the testimony of a handwriting expert is insufficient to sustain a verdict against the will: DeLaurentiis' Estate, 323 Pa. 70 (1936); Porter's Estate, 341 Pa. 476 (1941); Pochron Will, 367 Pa. 306 (1951); Peterman Will, 367 Pa. 302 (1951); Kadilak Will, 405 Pa. 238 (1961). In the case last named, there was but one witness who saw testator execute his will; two others testified he told them it was his will and two more testified that they thought the signature genuine. In the matter before us, there were three witnesses to the execution, all of whom signed as such in each other's presence and in the presence of testator.

Contestants employed the fact that there were three witnesses to develop the thought that the preparation

of the will had elements of strangeness or peculiarity, that there was a shroud of mystery about the matter. The proponent produced from decedent's files a batch of wills decedent had written for clients. In a number of them, three witnesses, including himself, had affixed their signatures. The contestants themselves produced a will prepared by decedent for a nephew in Chicago. It, too, bore the signatures of three witnesses.

The inclusion in the will before us of the clause denying the sister any part of the estate can not be considered an unnecessary and perhaps suspicious element because it was established as fact that testator detested her and wanted no part of her in his life.

## 2. *Additional Facts Concerning the Will*

Before referring to contestants' expert testimony questioning the authenticity of testator's signature and the testimony adduced in rebuttal, consideration must be given to additional evidence concerning the history of the will following its execution.

On September 12, 1960, testator died of a coronary seizure following a heart attack at his home. The following morning the event was discussed by two of his office associates, Maurice S. Strauss, Esq., and Herbert Somerson, Esq. They went into decedent's office and removed from his unlocked filing case the file containing the will located under "D". They knew it was there, because Mr. Strauss, a member of the bar for over 30 years, testified that two or three weeks before his death decedent had called him into the latter's office and said to him: "I want to show you where my will is". Thereupon, decedent pulled a file marked "Will of Max Daroff" out of the top drawer of a cabinet and showed it to Strauss.

The two lawyers withdrew the will on September 13th. They saw that Baran was named as attorney and that Esther Glantz was named as sole beneficiary.

Baran was asked to come over to the office, because it was he who was to handle the matter of the will. The testimony of these members of the bar was uncontradicted and completely satisfied the court.

Early in the morning of September 13, 1960, Baran went to decedent's office in the Land Title Building where, in the presence of Messrs. Strauss and Somerson, he was given the will. Baran telephoned Miss Glantz to come to decedent's office to confer with him, which she did. As the will contained the provision that there were to be no funeral services and that the body of testator was to be cremated, Baran decided to see an orphans' court judge for advice. On doing that, he was advised to probate the will after consulting with decedent's cousin, Samuel Daroff. On September 14, 1960, the will was probated. Against the wishes of relatives of decedent, but pursuant to the testamentary instructions, the body was cremated on the same day and, presumably, the ashes were scattered or "discarded". There was no viewing, no ceremony, religious or otherwise, no burial, no urn. While decedent attended memorial services in synagogues, he was not a member of the congregation. Cremation is prohibited by the conservative Jewish faith but decedent had the right to be cremated.

### 3. *Expert Testimony*

Contestants called Mrs. Hanna F. Sulner, a disputed documents expert of New York City, who testified that Lewis Darrow had employed her to examine authentic signatures of decedent and the questioned signatures on the probated will. She said that, in her opinion, the signatures had been done very quickly and that the will had been forged by an expert. She asserted that the signature at the end of the second carbon copy, exhibit P-3, was written over the signature line at two small points in such fashion as to show that the typed line and name "Max A. Daroff" thereunder had been placed

on the paper after the signature itself. In her opinion, this was unquestionable evidence that the piece of paper had been signed in blank and that the two pages of the will had been signed before they had been typed.

In rebuttal the proponent called two handwriting experts who testified that the will was not forged but had been executed by Max A. Daroff.

Leon W. Melcher, an expert of 46 years' experience and a member of the bar, testified under subpoena that shortly before November 2, 1960, he had been solicited by Lewis Darrow to advise him as to the authenticity of the probated will. This Mr. Melcher did. After examining the disputed will and signatures of decedent, he found that there was no evidence of forgery and told Darrow he could not testify that there was. The employment ended. At the trial, Mr. Melcher said, unequivocally, that the signature to the will was authentic. He refused to accept a retainer in order not to represent conflicting interests.

Mrs. Pearl Tytell, also a New York City disputed documents expert, testified that after examining many authentic signatures of decedent and that on the will, there was no doubt whatsoever in her mind that the will had been signed by Max A. Daroff. This witness gave a comprehensive statement of the procedures she followed in attaining the results given. She said that testator's signature was made by a nib pen with fluid ink, that the writing on exhibit P-3 was done over the typewriting, that it was easier to detect a forgery if there were six alleged forged signatures rather than one, and that all three documents were signed at one time.

The testimony of proponent's witnesses effectively rebuts that of contestants' expert. Any suspicion of forgery suggested by her testimony is dissipated. In any event, in view of the uncontradicted testimony of the court's witnesses, none of the expert testimony is of

the same weight as that of the persons who directly witnessed the signing of the three copies of the will.

### 4. *A Natural Will*

Moreover, this is a natural will. Dr. Albert Dickman, a friend for 10 or 11 years, testified that decedent detested his family vehemently and hated his brother and sister. Colonel William Perry testified that for approximately 30 years he had known decedent, who referred to his brother as a bastard. He added that decedent did not bother with his sister and that "if you ever mentioned that name of Lew Darrow to him he would punch you in the mouth". Esther Glantz testified that decedent told her: "We don't discuss my family and remain friends". David Gibbs testified that decedent was annoyed with his brother and his sister. Apparently, at least one source of decedent's disapproval of his brother and sister was their failure to demonstrate expected interest in the welfare of their widowed father to whom Max Daroff showed loving care and affection.

It is obvious why testator left nothing to the brother or sister. The woman he had known familiarly for seven or eight years was the natural object of his affections. Colonel Perry testified that decedent said to him, referring to the then Miss Glantz: "I think we will go to Florida and get married." Although the witness, David Gibbs, testified that decedent had said that he wanted to remain a bachelor, decedent's directions to the scrivener clearly indicate that the woman with whom he consorted regularly for a period of years up until his death was the person to whom he wished to give his estate.

As to the contingent beneficiaries it was not unnatural for decedent to give them the estate if Esther Glantz did not survive testator. He had been for years active in the affairs of Temple University School of Law, as chairman of the Lecture Committee of the

alumni association, and had raised funds for the new library. He was a very active member of the American Cancer Society. Morris Paul Baran testified that he thought that his relationship with testator was very close. There is nothing unusual in an older lawyer confiding in a younger one and showing an interest in his future.

Finally, Esther Glantz Gross, called in cross examination, testified that she was introduced to decedent in 1951 or 1952, that they saw each other soon afterward, and by 1956 their meetings, largely over week-ends in town or at the shore, were frequent and regular. She never. discussed his will with him, and the first time she knew that she was mentioned in it was the day after her friend died, when Baran told her that she was his sole beneficiary. Mrs. Gross testified that she knew from conversations with decedent that he did not want a funeral. She considered herself to be his "steady girl friend" and told him that she loved him. She testified that decedent felt the same way and that he promised to marry her. All of this testimony is binding on the contestants as Mrs. Gross was their witness.

5. *The Trial Judge's Power to Enter Judgment*

Exception no. 8 to the action of the trial judge in finding in favor of the will after the jury disagreed is without merit. There can be no doubt as to the source or the nature of the authority vested in him and exercised by him in the case at bar.

The trial judge, sitting as a chancellor in a will contest, may supersede, or supplement or vitiate the finding of a jury where such finding does not satisfy his conscience. In Williams v. McCarroll, 374 Pa. 281 (1953), Mr. Justice Bell, now Chief Justice, stated the law in Pennsylvania as follows, page 297:

"The law is clearly established that that was within the authority, power and discretion of the hearing Judge, [referring to a Chancellor setting aside a ver-

dict and entering judgment] whether he was sitting as a Chancellor in the Court of Common Pleas or as a hearing judge in the Orphans' Court, because the verdict of the jury is advisory only and the Chancellor or Judge who sees and hears the witnesses must enter a judgment in accordance with his conscience after and upon consideration of the entire record." Citing Stewart Will, 354 Pa. 288 (1946); Shuey v. Shuey, 340 Pa. 27 (1940); Roberts Will, 373 Pa. 7 (1953); Phillips' Estate, 244 Pa. 35 (1914).

The law so stated was made crystal clear by the legislature in enacting section 745(a) of the Orphans' Court Act of August 10, 1951, P. L. 1163, as amended by the act made effective February 10, 1956, P. L. 1022, 20 PS §2080.745(a), providing as follows:

"When a substantial dispute of fact shall arise concerning the validity of a writing alleged to be testamentary, any party in interest shall be entitled to a trial of this fact by a jury, *but the verdict of the jury shall be conclusive only if the court is satisfied with the justness of it on the basis of all the evidence. If the court is not so satisfied, it may set aside the verdict, grant a new trial or enter such other judgment as satisfies its conscience.*" (Italics supplied.)

This amendment was, according to the comment of the Joint State Government Commission, ". . . intended to reintroduce the rule of Stewart Will, 354 Pa. 288, 295; Williams v. McCarroll, 374 Pa. 281, 287; and Flemings Est. 265 Pa. 399 and makes it clear that the orphans' court has control over the verdict."

Section 745(a) was deleted, but the provision that jury verdicts were to be advisory only was reenacted by the Act of July 14, 1961, P. L. 610, which contains section 745(e) reading:

"When a contest shall arise concerning the validity of a writing alleged to be testamentary . . . the court, in its discretion at any stage of the proceedings, may

impanel a jury to decide any question of fact but the verdict of the jury shall be advisory only."

Under this statutory authority, a jury verdict in a will contest may be set aside or a new trial can be granted or such other judgment may be entered as satisfies the conscience of the trial judge. Hence, the sole question presently before the court is this: Did Judge Bolger act reasonably in reaching his decision in view of the record before him?

Mr. Justice Bell said in Williams v. McCarroll, 374 Pa. 281, 298, 299 (1953), as follows:

"The test to be applied by an appellate court in reviewing the entry by a Chancellor or hearing Judge of a judgment *non obstante veredicto* in favor of the proponents of a will following the verdict of a jury on an issue *devisavit vel non*, is not whether the appellate court would have reached the same result, had it been acting as Chancellor and seen and heard the witnesses, ' "but rather whether a judicial mind, on due consideration of the evidence as a whole, could reasonably have reached the conclusion of the chancellor . . ." ' "

Unmistakably, the trial judge had the power (1) to discharge the jury when it failed to reach a verdict and (2) to determine the issue under the authority conferred upon him as a chancellor by the act of assembly referred to.

### 6. *So-Called After-Discovered Evidence*

The contention of contestants' exception no. 9, that they are entitled to a new trial because of after-discovered evidence, is without merit. Their affidavit concerns matter admitted at the trial when it was testified by their handwriting expert that the typewriting of testator's signature line and the name thereunder on the copies of the will were made after the signature had been written.

To warrant the award of a new trial, after-discovered evidence must have three attributes: (1) It

must be of such a nature that reasonable diligence prior to the trial could not have procured it; (2) it must not be merely cumulative and of a character to impeach credibility, and (3) it must be likely to effect a result different from that reached at the trial where it was not presented: Hagopian v. Eskandarian, 396 Pa. 401 (1959); Helmig v. Rockwell Mfg. Co., 389 Pa. 21 (1957); Felo v. Kroger Grocery & Baking Co., 347 Pa. 142 (1943).

Contestants argue on the basis of Mrs. Sulner's testimony that the signature on the carbon copy of the will (exhibit P-3) on examination is found to be beneath the marks made by the typewriter. They wish to have a jury examine these markings, as magnified by microscope and photographed, by being projected on a screen through transparent slides.

Testimony as to the overtyping was not only introduced at the trial but was the subject of considerable attention. Members of the jury were allowed by the trial judge to look at the signatures on the probated will and the two executed copies thereof (exhibits P-1, P-3 and P-4) with the aid of a microscope. This examination was later curtailed by the trial judge as one for experts. They alone have spent years of study and have the benefit of experience not enjoyed by a judge or jury. At argument before the court en banc, contestants' counsel requested the court to receive the photographic slides. The offer was refused with the consent of the trial judge sitting with his colleagues.

To contend that because in exhibit P-3, and in it alone, two bits of testator's signature approximately one-thirty-second of an inch deep overlap a signature line and that the overtyping can be observed with the aid of a microscope and blown-up photographs exhibited on a screen, is to argue that a jury of laymen is competent to reach a conclusion that a forgery is thereby evidenced, a forgery not merely of that signature

but of all other signatures of the testator in the three executed wills.

Mrs. Tytell stated that training is required to enable one to use a microscope on a signature as it takes an expert to determine the results of such use. She said that in making the impression through the typewriter ribbon and the carbon sheet on the paper of the carbon copy of the will, there is left a deposit which effectively repels the liquid ink used by the writer, thereby producing the illusion that the typing was done after rather than before the writing.

For various reasons, the claim of after-discovered evidence must fail. The evidence which contestants belatedly seek to offer at a new trial was known to them at the trial which has been had. Furthermore, had contestants been diligent, they could have had photographs made at any time during the nine days of the trial. Even if the so-called after-discovered evidence were the basis for granting a new trial and a new trial was held, such evidence could not compel a result any different from that already reached under the law of Pennsylvania. For, after all, it is only opinion evidence of a character peculiarly vulnerable to the principle that testimony by an expert, standing alone, cannot sustain a finding of forgery where there is direct and credible evidence to the contrary, as is so noticeably present in this case. Moreover, there was positive expert testimony that the signatures were genuine. A new trial could not be granted unless it could now be held that the alleged newly discovered evidence would compel judicial conscience to reject the testimony of the actual witnesses and the other expert witnesses. It does not.

Manifestly, contestants intend to demonstrate their so-called after-discovered evidence for the purpose of proving conclusively that all three of the subscribing witnesses have committed perjury and that the two

lawyers who testified as to the identification of the will by testator and its presence in testator's own files at the time of his death were likewise perjurers. Is it likely that these five witnesses, not one of whom is a beneficiary under the probated will, would in a body testify falsely, especially in a court of which three are officers? To ask this question is to answer it.

### 7. *That There Was a Forgery is Incredible*

There is something curious and inexplicable about contestants' insistence that the carbon copy of the will (exhibit P-3) was signed on page 2 before the typing was made upon it. As their own witnesses asserted that this was true of both pages of all three documents, the original and the carbon copies, there could be two and only two possibilities: (1) The forger or forgers would have had to obtain six sheets of paper that were blank except for the Daroff signature in order to type the will thereon; (2) the wills were typed in triplicate and then signatures forged on all three. If the signatures had been made by decedent himself and the pages were used by the forger in making them serve as wills disposing of his estate, the contestants' expert testimony that they were not in Daroff's handriting is worthless. If they were not the authentic signatures of Daroff but those of a forger, as testified to by Mrs. Sulner, then what was the necessity of his forging a signature on each of six sheets of paper before typing the will? This compels the conclusion that the signatures were made by Daroff himself. The contestants cannot have it both ways, and their expert's testimony becomes incomprehensible.

In other words, if the six signatures on the three copies were not in the handwriting of Max A. Daroff, as the court's witnesses testified without equivocation or contradiction they were, then what was the need or the purpose of the forger or forgers in arranging for the typing of the signature line, name thereunder, and,

in fact, the entire contents of the will *after* and not *before* the signatures were written?

All of which goes to show the possible reason for the jury's failure to reach a conclusion and perhaps for its inability to understand what the contestants were trying to prove. Indicative of this confusion is the question of one of the jurors which contained this statement:

". . . I think the possibility exists that these witnesses weren't lying but there is a possibility that the will was forged. I mean, you seemed to make a really cut and dried thing. If these witnesses lied then the will was automatically a forgery, but I think the possibility exists these witnesses of their own knowledge did not lie, but the will still could have been a forgery."

There have been many attempts in this will contest to suggest suspicion and to raise doubts. Much time has been consumed by all parties involved in reaching the point where testator's will has been upheld and the objects of his bounty are to receive their due. To grant a new trial on the flimsy pretext that microscopic photographs, of one signature out of six affixed by testator, should be exhibited to 12 laymen and a judge, none of them handwriting experts, would be an intolerable act prolonging the final determination of the litigation. The issue is an altogether simple one, crying for final disposition over three and a half years after decedent's death and following prolonged efforts to make a mountain out of the molehill imagined by a confused and embittered man.

Who could the forger be, were there one, as charged by the contestants? In their brief before the court en banc their counsel says:

"We do not intimate that either the proponent or her counsel are guilty of wrong-doing."

One of proponent's counsel, acting for her as executrix, is Morris Paul Baran. During the trial, Mr. Rich-

ette charged him with being the forger but then retracted such charge and said that Baran was one of the conspiracy that forged the will. Who then could be guilty? For what end would anyone other than the beneficiary of the will or a party privy to her have followed the involved and devious course suggested by the contestants in forging it? And what forger would attempt to falsify the signature of the purported testator more than once? Certainly, no forger would expose his act to determination of its real character by signing the three copies of the will six times.

Contestants rely principally on Young Estate, 347 Pa. 457 (1943), where a will was found by a jury to be a forged will. But, there, no scrivener appeared to give testimony, and the testimony of the expert that it was a forgery was corroborated by probative facts and circumstances not present in the case at bar. Moreover, in Young Estate the will was in the possession of the proponent and the signature of the alleged testatrix, Maud Young, was uniformly preceded by the abbreviation "Mrs." except in the probated will. The court wisely said, page 461:

"A forger would rather forge nine letters of a name than twelve letters."

The Daroff will was in decedent's possession until his death and the 10 letters of "Max A. Daroff" were allegedly forged, not once but six times. The case is not apposite.

Numerous false trails have been followed, only to be abandoned by contestants. Girard Trust Bank was ordered to produce a prior will of decedent in its custody. Its representative was not called. The nature of the portable typewriter used by the scrivener's sister was in question, and the machine was produced to little purpose. Charges of forgery against Baran and of murder against Mrs. Gross were abandoned. The time has come to conclude the litigation.

## 8. *Summary*

There are several compelling reasons for the conclusion of the trial judge that the probated will was signed by Max A. Daroff. They may be summarized as follows:

a. Three subscribing witnesses including the scrivener, all of whose testimony was unshaken, established by uncontroverted evidence the preparation and execution of the will.

b. Two disinterested members of the bar proved by their testimony that the will was in decedent's possession at his death.

c. Two handwriting experts established the authenticity of decedent's signatures on the will.

d. The testimony of contestants' handwriting expert was contradictory and led to a reductio ad absurdum.

e. There were six signatures to three exact copies of the will by testator and three by each of three witnesses.

f. The will makes a natural disposition of testator's estate and there was no proof of fraud in its preparation and execution.

g. The charges of forgery (1) before the will was typed and (2) after it was typed are inconsistent. If the will was typed following decedent's signatures the expert's testimony as to forged signatures is meaningless. If the signatures were imposed by a forger after the will was typed, the expert's testimony to the country is worthless.

h. The existence of three completely executed copies of the will, each bearing five signatures, is mute evidence against the contention that the signatures were forged, because the forging of 15 signatures by anyone to achieve a result that one signature could accomplish is utterly beyond human belief.

### 9. *Conclusion*

It must be concluded that the trial judge acted properly and with complete justification in exercising the powers of a chancellor under the statute and in entering his decree. Throughout a long and tedious trial, lasting nine court days and interspersed with frequent conferences with counsel in chambers, the trial judge conducted himself in an objective manner under difficult circumstances and when provocation was frequent. Figuratively speaking, he leaned over backward to permit counsel to prove their case. He was generous in his rulings on admission of testimony and other evidence. Exception no. 1, charging him with error in examining contestants' expert witness is without substance.

The decision upholding the will is completely justified in the light of the uncontradicted and unimpeached testimony of the subscribing witnesses: Pockron Will, supra; Peterman Will, supra, and Kadilak Will, supra. The expert testimony of contestants' handwriting expert is entitled to no consideration.

The accountants have not proven their charge of forgery. Unquestionably, the probated will is the genuine will of Max A. Daroff. No substantial issue of fact has been established. No reason has been shown for sustaining the appeal from probate nor for granting a new trial.

Accordingly, all exceptions are dismissed, and the motion for a new trial is denied.